**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      v.

CHRISTOPHER HARRIS,

         Defendant.

21-CR-772 (AT)

**SENTENCING MEMORANDUM OF CHRISTOPHER HARRIS**

Noam Biale
Katie Renzler
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
NBiale@shertremonte.com

*Attorneys for Christopher Harris*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

FACTUAL BACKGROUND ................................................................................... 3

    I.      Childhood and Young Adulthood .......................................................... 3

    II.     History of Substance Abuse ................................................................... 7

    III.    Educational and Employment Background ........................................... 9

    IV.    Mental Health Treatment ..................................................................... 10

    V.      Offense Conduct and Arrest .................................................................. 11

    VI.    Conditions of Confinement .................................................................. 11

    VII.   Plea Agreement ..................................................................................... 14

    VIII.  PSR and Probation Department Recommendation ............................... 14

    IX.    Safety Valve Proffer and Relevant Facts Concerning the Firearm
            Mr. Harris Possessed ........................................................................... 17

ARGUMENT ........................................................................................................ 19

    I.      Mr. Harris Properly Belongs in Criminal History Category III ........... 19

           A.     Mr. Harris Has Fewer Criminal History Points Under Guidelines
                   Amendment 821 ......................................................................... 20

           B.     Mr. Harris Does Not Qualify as a Career Offender ................... 21

           C.     Mr. Harris's Criminal History Category Overstates the
                   Seriousness
                   of His Criminal History ............................................................ 25

    II.     Mr. Harris Satisfies the Requirements of 18 U.S.C. § 3553(f) and
            Is Eligible for Safety Valve Relief ....................................................... 26

           A.     Legal Standard ........................................................................... 27

            B.     Mr. Harris Satisfies All the Requirements for Safety Valve
                   Eligibility ................................................................................... 28

          i.      Mr. Harris Indisputably Satisfies Three of the Five Eligibility Criteria ........................................................... 28

          ii.     Mr. Harris Did Not Possess a Firearm "in Connection" with His Offense ..................................................... 29

          iii.    Mr. Harris Provided Truthful and Complete Information to the Government During the Proffer .......................... 34

III.    The Court Should Vary Downward from the Sentencing Guidelines Range ......................................................................................... 36

IV.    The § 3553 Factors Warrant a Sentence of Three to Five Years ......................... 39

    A.    Legal Standard .......................................................................... 40

    B.    Mr. Harris's Personal History and Characteristics Warrant a Sentence of Three Years' Imprisonment ..................................... 41

          i.      Mr. Harris's Background and the Circumstances of His Childhood Place His Life Choices in Context ............................. 41

          ii.     Mr. Harris Is Genuinely Remorseful and Committed to Building a New, Law-abiding Life ................................. 45

          iii.    Mr. Harris Is a Caring, Positive, and Intelligent Person Who Has Much to Offer His Community .................................... 46

    C.    The Conditions of Confinement to Which Mr. Harris Has Been Subjected Warrant Leniency .................................................... 47

    D.    A Sentence of Three to Five Years Is Sufficient to Meet the Goals of Sentencing ................................................................... 50

    E.    The Mandatory Minimum Sentence Fails to Achieve the Purposes of Sentencing ........................................................................ 52

CONCLUSION .......................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007) ........................................................................................ 37, 40

*Kimbrough v. United States*,
552 U.S. 85 (2007) ............................................................................................... 37

*Pepper v. United States*,
562 U.S. 476 (2011) ........................................................................................ 40, 41

*Smith v. United States*,
508 U.S. 223 (1993) ........................................................................................ 29, 30

*United States v. Al Halabi*,
563 F. App'x 55 (2d Cir. 2014) ............................................................................ 40

*United States v. Anderson*,
452 F.3d 87 (1st Cir. 2006) ........................................................................ 32, 33, 34

*United States v. Bannister*,
786 F. Supp. 2d 617 (E.D.N.Y. 2011) .............................................................. 43, 44

*United States v. Bean*,
371 F. Supp. 3d 46 (D.N.H. 2019) ............................................................ 36, 38, 39

*United States v. Bingham*,
--- F.4th ---, 2023 WL 8722172 (7th Cir. Dec. 19, 2023) .................................. 32

*United States v. Bolka*,
355 F.3d 909 (6th Cir. 2004) ............................................................................... 32

*United States v. Bolton*,
858 F.3d 905 (4th Cir. 2017) ............................................................................... 32

*United States v. Boyd*,
No. 21-CR-486 (SHS), 2022 WL 790771 (S.D.N.Y. Feb. 3, 2022) ...................... 48

*United States v. Carillo-Ayala*,
713 F.3d 82 (11th Cir. 2013) ......................................................................... 30, 32

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008) ............................................................................... 40

*United States v. Chavez*,
  No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024) .......................................................... 49

*United States v. Collins*,
  924 F.3d 436 (7th Cir. 2019) ................................................................................ 28, 35

*United States v. DeJesus*,
  219 F.3d 117 (2d Cir. 2000)......................................................................................... 29

*United States v. Diaz*,
  No. 11-CR-00821-2 (JG), 2013 WL 322243 (E.D.N.Y. Jan. 28, 2023) ...................... 36

*United States v. Dossie*,
  851 F. Supp. 2d 478 (E.D.N.Y. 2012) .................................................................. 52, 53

*United States v. Ferguson*,
  No. CR 17-204 (JRT/BRT), 2018 WL 3682509 (D. Minn. Aug. 2, 2018) ................ 36

*United States v. Gully*,
  619 F. Supp. 2d 633 (N.D. Iowa 2009) ...................................................................... 39

*United States v. Harry*,
  313 F. Supp. 3d 969 (N.D. Iowa 2018) ........................................................... 36, 37, 39

*United States v. Hartle*,
  No. 4:16-cv-00233-BLW, 2017 WL 2608221 (D. Idaho June 15, 2017)............... 37, 38

*United States v. Hayes*,
  948 F. Supp. 2d 1009 (N.D. Iowa 2013)................................................................. 36, 37

*United States v. Hendrickson*,
  25 F. Supp. 3d 1166 (N.D. Iowa 2014)................................................................... 44, 45

*United States v. Hoover*,
  No. 4:17-CR-327-BLW, 2018 WL 5924500 (D. Idaho Nov. 13, 2018)...................... 36

*United States v. Ibarra-Sandoval*,
  265 F. Supp. 3d 1249 (D.N.M. 2017) ......................................................................... 36

*United States v. Jimenez*,
  451 F.3d 97 (2d Cir. 2006)............................................................................................ 27

*United States v. Johnson*,
  379 F. Supp. 3d 1213 (N.D. Ala. 2019)................................................................... 36, 37

*United States v. Jones*,
  878 F.3d 10 (2d Cir. 2017)............................................................................................ 22

*United States v. Lopez-Cano*,
  516 F. App'x 350 (5th Cir. 2013) ................................................................. 24

*United States v. Miller*,
  179 F.3d 961 (5th Cir. 1999) ..................................................................... 28

*United States v. Miranda-Santiago*,
  96 F.3d 517 (1st Cir. 1996) ................................................................. 28, 32

*United States v. Mishoe*,
  241 F.3d 214 (2d Cir. 2001) ...................................................................... 50

*United States v. Myrie*,
  753 F. App'x 855 (11th Cir. 2018) .............................................................. 29

*United States v. Nawanna*,
  321 F. Supp. 3d 943 (N.D. Iowa 2018) ......................................................... 36

*United States v. Nelson*,
  222 F.3d 545 (9th Cir. 2000) ................................................................. 32, 34

*United States v. Ocampo-Estrada*,
  873 F.3d 661 (9th Cir. 2017) ................................................................. 24, 25

*United States v. Perez*,
  325 F. Supp. 3d 1058 (N.D. Cal. 2018) ....................................................... 24

*United States v. Renteria-Aguilar*,
  766 F. App'x 557 (9th Cir. 2019) ................................................................ 24

*United States v. Rivera*,
  281 F. Supp. 3d 269 (E.D.N.Y. 2017) .......................................................... 52

*United States v. Rivera*,
  No. 16-CR-66 (S.D.N.Y. May 11, 2020) ........................................................ 48

*United States v. Saldana*,
  No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790 (W.D. Mich. July 3, 2018) ............... 36, 39

*United States v. Sanchez-Garcia*,
  642 F.3d 658 (8th Cir. 2011) ..................................................................... 24

*United States v. Scott*,
  990 F. 3d 94 (2d Cir. 2021) (en banc) .................................................... 52, 54, 56

*United States v. Shaban*,
  No. 21 Cr. 314 (GHW), 2021 WL 4078020 (S.D.N.Y. Sept. 8, 2021) ..................... 48

*United States v. Singh*,
    877 F.3d 107 (2d Cir. 2017) ................................................................... 41

*United States v. Smith*,
    Crim. No. 3:21cr202 (JBA), 2023 WL 1350271 (D. Conn. Jan. 31, 2023) ............................ 25

*United States v. Snow*,
    462 F.3d 55 (2d Cir. 2006) ............................................................. 29, 30

*United States v. Stamps*,
    983 F.3d 945 (7th Cir. 2020) ................................................................. 33

*United States v. Thavaraja*,
    740 F.3d 253 (2d Cir. 2014) ................................................................... 40

*United States v. Townsend*,
    897 F.3d 66 (2d Cir. 2018) ......................................................... 21, 22, 23

*United States v. Turner*,
    291 F. App'x 438 (2d Cir. 2008) ............................................................. 44

*United States v. Valdavinos-Torres*,
    704 F.3d 679 (9th Cir. 2012) ................................................................. 24

*United States v. Walker*,
    252 F. Supp. 3d 1269 (D. Utah 2017) ....................................................... 44

*United States v. Wysinger*,
    64 F.4th 207 (4th Cir. 2023) ................................................................. 23

*United States v. Young*,
    766 F.3d 621 (6th Cir. 2014) ................................................................. 53

*United States v. Zavalza-Rodriguez*,
    379 F.3d 1182 (10th Cir. 2004) ............................................................. 32

**Statutes**

18 U.S.C. § 841 .............................................................................. 19

18 U.S.C. § 924 .............................................................................. 29

18 U.S.C. § 3143 ............................................................................ 49

18 U.S.C. § 3553 ..................................................................... *passim*

21 U.S.C. § 812 .............................................................................. 23

21 U.S.C. § 841 .................................................................. 14, 26, 36, 53

21 U.S.C. § 846 ............................................................................................................ 14

California Health and Safety Code § 11378 .............................................. 23, 24, 25

N.Y.P.L. § 220.31 ......................................................................................................... 23

Va. Code § 18.2-248 ............................................................................................... 23, 24

Va. Code § 54.1-3446 .................................................................................................. 23

**Rules**

U.S.S.G. § 1B1.11 ......................................................................................................... 20

U.S.S.G. § 2D1.1 ...................................................................................................... 14, 15

U.S.S.G. § 4A1.1 .................................................................................................... *passim*

U.S.S.G. § 3E1.1 ........................................................................................................... 39

U.S.S.G. § 4A1.2 ...................................................................................................... 15, 16

U.S.S.G. § 4B1.1 .................................................................................................... *passim*

U.S.S.G. § 4B1.2 ........................................................................................................... 23

U.S.S.G. § 5C1.2 .............................................................................................. 27, 29, 36

**Other Authorities**

Alison Siegler, *End Mandatory Minimums*, Brennan Center for Justice (Oct. 18, 2021),
    https://www.brennancenter.org/our-work/analysis-opinion/end-mandatory-
    minimums#:~:text=The%20bipartisan%20Smarter%20Sentencing%20Act,
    minimums%20and%20respects%20human%20dignity ......................................... 55

Anthony M. Kennedy, *Speech at the Am. Bar Ass'n Annual Meeting* (Aug. 9, 2003),
    https://www.supremecourt.gov/publicinfo/speeches/sp_08-09-03.html ................... 52

Associated Press, *56 Suspects Arrested After Systemic Looting and Theft During
    George Floyd Protests in California*, ABC 7 (August 27, 2020), https://abc7.com/looting-
    protests-in-los-angeles-george-floyd-black-lives-matter/6391666/ ......................... 30

Aya Elamroussi, *Omicron surge is 'unlike anything we've seen,' says exper*t,
    CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/Us-coronavirus-
    Thursday/index.html ................................................................................................. 47

Daniel Nagin and Greg Pogansky, *Integrating Celerity, Impulsivity, and
    Extralegal Sanction Threats into a Model of Deterrence: Theory and Evidence*,
    Criminology, 39(4) (2001) ......................................................................................... 51

Gerard E. Lynch, *Sentencing Eddie*, 91 J. Crim. L. & Criminology 547 (2001) ........................ 52

*Images: Violence Flares Up on the Streets of Los Angeles*, NBC Los Angeles
(June 8, 2020, 11:40 a.m.), https://www.nbclosangeles.com/news/local/george-floyd-protest-los-angeles-police-lapd/2370927/ ...................................................... 30

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1 (2006) .................. 51

Miech, et al., *Monitoring the Future national survey results on drug use, 1975–2023: Secondary school students*, Monitoring the Future Monograph Series, Institute for Social Research, Univ. of Mich., https://monitoringthefuture.org/results/annual-reports/ ............................................................................................................ 54

Pew Charitable Trusts, *More Imprisonment Does Not Reduce States Drug Problems*, Mar. 2018, https://www.pewtrusts.org/-/media/assets/2018/03/pspp_more_imprisonment_does_not_reduce_state_drug_problems.pdf ............................................................................................................ 54

Stephen Rex Brown, *Brutal Conditions in NYC Jails During COVID Pandemic Caused Federal Judges to Impose Lighter Sentences: Analysis*, N.Y. Daily News (July 11, 2021), http://www.nydailynews.com/new-york/ny-federal-judges-gave-lighter-sentences-nyc-jails-covid-20210712-owlofn4wzngmfmcgb6raighkvq-story.html ................. 48

U.S. Dep't of Justice, Nat'l Institute of Justice, *Five Things About Deterrence*, https://www.nij.gov/five-things/pages/deterrence.aspx ............................................................. 51

U.S. Sentencing Comm'n, *An Overview of Mandatory Minimum Penalties in the Federal Criminal Justice System* (July 2017) ...................................................... 55

U.S. Sentencing Comm'n, *Mandatory Minimum Penalties for Drug Offenses in the the Federal Criminal Justice System* (Oct. 2017) ...................................................... 55

## PRELIMINARY STATEMENT

Christopher Harris, by and through his undersigned attorneys, Sher Tremonte LLP, respectfully submits this memorandum in anticipation of his sentencing, which is scheduled for January 30, 2024.

When Mr. Harris was twelve years old, he was abruptly banished from the home he shared in Tennessee with his father, stepmother, and stepsisters, and shipped back to his mother in California. Shortly thereafter, he learned that the man he believed to be his father was not. Although Mr. Harris's relationship with that man, Arvell Edmundson, was difficult—characterized by physical abuse and disdain from Mr. Edmundson's partner—it was the only father-son relationship Mr. Harris had ever known. Almost immediately after learning the news, adolescent Mr. Harris smoked marijuana for the first time, setting off what became a twenty-year, untreated struggle with substance abuse. Until his arrest on the instant offense, Mr. Harris nearly continuously used a slew of substances: marijuana, alcohol, Xanax, Oxycodone, cocaine, and "Lean," a cough syrup mixture with Codeine and Promethazine. By his own account, Mr. Harris used drugs to numb himself to painful realities in his life, including the absence of a father. He spiraled downward and now faces sentencing for the second time for the same offense—selling narcotics over the internet. Despite his troubled background and severe addiction, however, Mr. Harris has managed to start his own business, be a warm and supportive son, grandson, and friend, and began seeking therapy prior to his arrest to address his longstanding emotional issues. Despite enduring harsh conditions of confinement, Mr. Harris has spent the twenty-six months of pretrial detention participating in substance abuse treatment and reconnecting with his family. He is committed to starting a new chapter of his life.

Considering Mr. Harris's background, and that this conviction constitutes his second serious offense (he previously served ten months for a similar crime), a sentence of three to five

1

years' imprisonment is appropriate.  Although Mr. Harris's conviction carries a ten-year

mandatory minimum term, that sentence is far more than necessary to achieve the purposes of

sentencing.  We therefore respectfully request that the Court find that Mr. Harris satisfies the

requirements for safety valve eligibility under 18 U.S.C. § 3553(f).  Mr. Harris proffered fully

and truthfully with the government and satisfies the other criteria under the statute.  Although

Mr. Harris possessed a gun contemporaneously with his offense conduct, he did not possess it in

connection with his narcotics-related conduct.  Rather, he purchased the gun for self-protection

following the riots in Los Angeles in the aftermath of George Floyd's murder, months before he

started selling drugs over the internet, and nearly a year later, when he opened his own smoke

shop, kept the gun there solely to protect the store.  He sold drugs over the internet and never met

any customers; the only possible connection between the gun the offense is speculative.

Accordingly, Mr. Harris is eligible for safety valve relief.

For the reasons stated below, we respectfully submit that a sentence of three-to-five

years' imprisonment is sufficient, but not greater than necessary, to achieve the purposes of

sentencing set forth in 18 U.S.C. § 3553(a).[1]

---

[1]     We attach to this submission the following exhibits:  A letter from Mr. Harris to the
Court (Exhibit A); letters from friends and family of Mr. Harris (Exhibit B); a list of programs
Mr. Harris completed while at Essex County Correctional Facility (Exhibit C); correspondence
among undersigned counsel, Probation, and the government regarding Mr. Harris's objection to
the PSR's designation of Mr. Harris as a career offender (Exhibit D); and an email from the
government, dated January 4, 2024, stating the government's position on Mr. Harris's eligibility
for safety valve relief (Exhibit E).

## FACTUAL BACKGROUND

### I.      Childhood and Young Adulthood

Mr. Harris was born in California on November 1, 1991.  When Mr. Harris was around

one year old, he and his mother, Andrea Harris, moved to Tennessee, where they lived for about

two years with Arvell Edmundson, whom Mr. Harris believed to be his father until he was

twelve.  Mr. Harris does not remember much about those two years in Tennessee, except that his

mom and Mr. Edmundson bickered frequently and one night his mother grabbed him in the

middle of the night, drove him to the airport, and the two boarded a plane to California.

Back in California, Mr. Harris lived with his mother, a pharmacy technician, in a small

apartment in Los Angeles.  Mr. Harris's mother worked hard to provide for him, often working

long hours and leaving Mr. Harris to fend for himself when he was as young as five years old.

Although his mother did her best, even as a young child Mr. Harris felt the strain of his family's

financial struggles.  They relied heavily on public assistance and Mr. Harris went hungry many

nights.  Despite the hardships, Mr. Harris largely recalls his early years in California with his

mother as happy times.

When he was in third grade, Mr. Harris started misbehaving in school.  Around the same

time, he was diagnosed with ADHD and received inconsistent treatment to help him manage the

diagnosis.  Unsure of how to improve her son's behavior, Ms. Harris decided to send him to

spend the summer with Mr. Edmundson in Nashville, Tennessee to "straighten him out"—even

though Mr. Harris had essentially no contact with Mr. Edmundson since leaving Tennessee when

he was three years old.  Following his summer in Tennessee, Mr. Harris returned to California to

repeat the third grade.  Although Mr. Harris was "promoted" to the fourth grade, he believes that

happened only because of the policy mandates of No Child Left Behind—not because his

behavior or performance improved.  Consistent with this recollection, following his second turn

3

at third grade, Ms. Harris sent her son back to Tennessee to live with Mr. Edmundson, where he stayed for the next three years, through the end of sixth grade.

In Tennessee, Mr. Harris lived with Mr. Edmundson, his then-girlfriend (now wife) Drew, and Drew's two daughters, Chanda and Amber.  Mr. Edmundson worked in sales and Drew worked in an administrative capacity at Vanderbilt University Medical Center.  Life in Tennessee came with more financial stability than in California, but it was rife with other problems.  Although Mr. Edmundson and Mr. Harris built a father-son bond through activities like barbequing, watching sports, and listening to music together, Mr. Edmundson had a volatile, violent side that left young Mr. Harris walking on eggshells.  When Mr. Edmundson drank, which was often, he would become aggressive, including by beating Mr. Harris with belts, especially when he received bad grades.  Mr. Edmundson also disregarded Mr. Harris's express interest in acting, forcing him to play sports instead in the misguided belief that he might become a pro athlete and make him rich.  Whereas there was some positivity in Mr. Harris's relationship with Mr. Edmundson, his dynamic with Drew was wrought with tension and spite.  She regarded him as a freeloader and regularly belittled him, for example by deriding him for the fact that his mother had sent him away.  It was clear to Mr. Harris that Drew did not want him in Tennessee. Unsurprisingly, Mr. Harris did not want to be there either—he wanted to go back to California to be with his mom.  He felt like he was being held in Tennessee against his will.

Mr. Harris also had difficult relationships with Drew's daughters.  Chanda, who is about six years older than Mr. Harris, never cared for him—she barely interacted with him, and when she did, it was unpleasant.  Drew's other daughter, Amber, is two years older than Mr. Harris.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

There was another reason for Mr. Harris's abrupt return.  A few months prior to his departure, Mr. Edmundson had approached Mr. Harris while he was playing video games and said he had to swab the inside of Mr. Harris's mouth, claiming it was necessary for insurance. He thought nothing of it at the time, but a few months later, after returning to California, Mr. Harris learned that when Mr. Edmundson swabbed his cheek, he was collecting DNA for a paternity test, and the test had revealed that Mr. Edmundson was not Mr. Harris's father.  Mr. Harris did not appreciate the emotional toll that news took on him, but the impact was exceedingly clear to those around him.  Ex. A (Letter of Christopher Harris).  His grandmother identifies this moment as a turning point for the worse in Mr. Harris's life, explaining that "this life event has had a long lasting negative effect on the decisions that Christopher has made."  Ex. B (Letter of Patricia McCroy Harris).  Within a matter of months of learning that Mr. Edmundson was not his father, Mr. Harris started smoking marijuana.  A neighbor around Mr. Harris's age was smoking marijuana and offered some to him—lacking guidance and in what he now recognizes was a state of depression, Mr. Harris tried marijuana, searching for a way to feel better.  It calmed the thoughts racing around in his head—thoughts about who his father was, how to process feelings of rejection and abandonment, and anxieties about his place in the world and his future.  Smoking was a coping mechanism.  When marijuana stopped doing the trick, Mr.

Harris turned to harder drugs, hoping they would.  As described in more detail below, Mr.

Harris's marijuana habit quickly spiraled out of control and his drug addiction grew to include

alcohol, cocaine, Xanax and other prescription drugs, and Promethazine/Codeine cough syrup

("Lean") that continued until his arrest in this matter.

Although she was his only remaining parent, Mr. Harris's relationship with his mother

deteriorated following the news that Mr. Edmundson was not his father.  During his years in

Tennessee, Mr. Harris and his mother stayed in touch; they spoke often, and Ms. Harris would

send him care packages with items that he needed.  After the revelation that Mr. Edmundson was

not his father, however, Mr. Harris "began to blame his mother for any difficulties that he

encountered. . . . He developed an anger and resentment towards his mother."  Ex. B (Letter of

Patricia McCroy Harris).  Their relationship only meaningfully improved in the months prior to

his arrest when he started attending therapy, where he began processing the traumas of his

childhood.  During Mr. Harris's incarceration, his relationship with his mother has continued to

improve as she has demonstrated her unwavering love and support for him.

Not long after moving back to California, Mr. Harris and his mother moved in with his

grandmother in Fontana, California, a small city in San Bernadino County, east of Los Angeles.

Mr. Harris and his grandmother developed a close relationship that continues to this day.  Mr.

Harris's grandmother was steadily employed at the Los Angeles County Office of the Public

Guardian for thirty-eight years, and living with her afforded Mr. Harris and his mother more

financial security.  She was attuned to his needs and did her best to provide him with support to

process his feelings of abandonment by Mr. Edmundson.  For example, after observing that Mr.

Harris "demonstrate[ed] anxiety behaviors," she "enrolled him in neurological feedback sessions

which appeared to help a lot." *Id.*  Because the sessions were very expensive, however, Mr.

Harris was unable to complete his course of treatment.  *Id.*  Just like with his childhood ADHD diagnosis, Mr. Harris's family tried to obtain the help he needed, but they were stymied by economic limitations.

Mr. Harris still does not know who his biological father is, nor has he ever found someone to play the role of father for him.  He felt that absence acutely in his teenage years.  His grandmother recalls that, during that period, when she "tried to give him counseling and guidance[,] he began to tell [her] that [she] could not understand because [she] was a woman." *Id.*  The void of a father figure continues to haunt Mr. Harris.  To this day, he feels that finding his father will "fix things."  In the months before his arrest, he was trying to locate his biological father, but the arrest cut his efforts short.  *See id.*; Ex. A (Letter of Christopher Harris).

## II.    History of Substance Abuse

Mr. Harris has a long history of substance abuse, but thankfully, for the first time in nearly twenty years, he is sober and clear-eyed.  Indeed, the more than two years that Mr. Harris has spent in custody constitute his longest stretch of sobriety since he was twelve years old. Starting around that time, when Mr. Harris learned that Mr. Edmundson was not his biological father, up until his arrest in the instant case, he has struggled with severe substance abuse.  PSR at ¶ 75 (Mr. Harris has "a varied and significant history of illicit substance use.").  Drugs and alcohol have provided Mr. Harris with an escape from reality.  They "helped him feel numb to[] the pain of not having any direction, and not having anybody to[] look up to[]."  Ex. A (Letter of Christopher Harris).  Only recently, in the months leading up to his arrest and while incarcerated, has Mr. Harris begun to comprehend the significant toll that his substance abuse has taken on him, including by derailing his education and steering him away from a lawful and productive life, despite his natural intelligence.  *Id.*

When Mr. Harris was twelve, he first experimented with marijuana, and by fourteen he was using it daily, continuing to do so until his arrest in November 2021.  PSR ¶¶ 75–76.  At sixteen, he started drinking alcohol.  Initially, he drank only occasionally, but by his early twenties he was drinking heavily.  In the period leading up to his arrest on the instant offense, he was drinking five times per week, including to intoxication and blacking out.  PSR ¶ 82.  Around the same time that he started drinking heavily, when he was twenty years old, Mr. Harris started using cocaine, and by the time he was twenty-seven (in 2018) he was using cocaine on a daily basis; between 2020 and his arrest, he was using cocaine at least three or four times a week.

In addition, at age seventeen, Mr. Harris tried "Lean," a cough syrup mixture with Codeine and Promethazine.  PSR ¶ 77.  By the time he was twenty (in 2011) and until he was arrested on state charges in 2018, he was drinking two-to-three ounces per day, and often mixing it with other substances.  PSR ¶ 77.  Following his release in 2020 and until his arrest on this offense, he was drinking "as much as possible," which was roughly two sixteen-ounce bottles per week.  Not only was this habit expensive—costing $6,000 one month in the summer before his arrest, for example—but it was also all-consuming.  Many of his days revolved around locating, procuring, and taking cough syrup—all while trying to present as a functioning adult, running his store, and keeping up with friends and family.

In addition to his persistent addictions to marijuana, alcohol, Lean, and cocaine, Mr. Harris has had periods of addiction to Xanax and Oxycodone.  Mr. Harris first tried Xanax when he was twenty-three years old, and quickly began using it three-to-four times per week.  PSR ¶ 80.  By 2018, he was taking between three and eight pills per day.  Following his release from custody in 2020, he dramatically decreased his Xanax intake, but continued to use it

recreationally.  For two years in his mid-twenties, Mr. Harris also used Oxycodone about ten times per month, in addition to other prescription drugs.  PSR ¶ 81.

Prior to his incarceration on the instant offense, Mr. Harris never sought any counseling or treatment related to his extensive drug use.  In the months leading up to his arrest, he had begun meeting with a therapist to discuss other personal matters, and in the course of that treatment had scratched the surface of his substance abuse issues.  While incarcerated, Mr. Harris has taken steps towards addressing his addiction by taking courses such an in-person substance abuse program and whatever online programs were available to him at Essex.  Ex. C (List of programs Mr. Harris completed at Essex).  He is able, for the first time since he was twelve, to look back at his life and see his wasted time and potential.  He is determined to use the rest of the time available to him productively—what he is able to accomplish will depend largely on whether he is incarcerated or free.  Ex. A (Letter of Christopher Harris).

### III.   Educational and Employment Background

Despite all of his challenges, Mr. Harris has always been a self-starter.  Although he dropped out of high school, by the time he was twenty-two years old he obtained his GED.  From approximately January 2020 until July 2020, Mr. Harris worked as a forklift operator at a Trader Joe's warehouse in Fontana, California.  Mr. Harris was laid off from that job as a result of the COVID-19 pandemic.  In March of 2021, less than a year after being laid off from Trader Joe's, however, Mr. Harris created an LLC and, in July of that year, he opened his own store, ZaZa Smokeshop.  At ZaZa Smokeshop, which was downstairs from Mr. Harris's apartment, Mr. Harris sold a variety of goods, including snacks, soda, and tobacco products.  The store was open and operating at a profit until shortly after Mr. Harris's arrest, when his mother closed the business on his behalf.

9

In addition to operating ZaZa Smokeshop, at the time of his arrest, Mr. Harris was developing plans to produce and launch "his own podcast discussing pop culture, politics and music." Ex. B (Letter of Mikhail Fekade). He is intellectually curious and regularly tries to teach himself new skills and learn about the world around him; for example, prior to his arrest he would "teach himself a new skill by watching YouTube videos" and "educate himself by . . . listening to podcasts[] and reading books." Ex. B (Letter of Mirna Abujudeh).

## IV.   Mental Health Treatment

In October 2020, Mr. Harris met Mirna Abujudeh, and his first healthy romantic relationship began. Prior to Ms. Abujudeh, Mr. Harris had shied away from serious relationships. He pursued flashy women who liked to go out and party. Ms. Abujudeh was different. She did not have a lot of money, she was not a party girl, and she wanted to get to know Mr. Harris for who he was. Like Mr. Harris, Ms. Abujudeh had a difficult childhood. She discussed her childhood traumas with Mr. Harris and convinced him to discuss his, for the first time in his life. They moved in together and were building a life with shared routines and a pet cat. Ex. B (Letter of Mirna Abujudeh). That said, the relationship was not perfect, and when it got rocky, Ms. Abujudeh encouraged Mr. Harris to speak with a therapist. Starting in early 2021 until his arrest in November of that year, he met with a therapist every one to two weeks. Mr. Harris discussed a range of topics in therapy, including his relationship with Ms. Abujudeh, how to improve his relationship with his mother, his lack of a father or father figure, his substance abuse, and how to process and react to challenging situations in more productive ways. He felt that therapy was teaching him a lot about himself and helping him improve his relationships and generally make better choices. Ex. A (Letter of Christopher Harris). Mr. Harris has inquired about mental health services while incarcerated, but he has not yet found a program that fits; he

plans to pursue regular mental health and drug abuse treatment once designated and following his release from prison.  *Id.*

## V.    Offense Conduct and Arrest

As Mr. Harris explained at his change of plea hearing, he sold methamphetamine and cocaine over the dark web for approximately a year, particularly on a site known as Torrez.  His customers paid him in cryptocurrency, which he converted to cash in order to buy more drugs.

On November 17, 2021, Mr. Harris was arrested.  Later that day, Mr. Harris agreed to speak with the arresting agents without an attorney present.  He participated in a nearly two-hour interview in which he granted access to his devices and answered all questions posed to him, including explaining that he sold methamphetamine and cocaine over the dark web and that he possessed a gun.

## VI.    Conditions of Confinement

Mr. Harris has been incarcerated for over two years since the day of his arrest.  During that time, he has endured especially difficult conditions of confinement due to a combination of factors, including the ongoing COVID-19 pandemic, the long distance from his family in California, █████████████████████████, and extended lockdowns.

Mr. Harris has spent his twenty-six months of incarceration on the East Coast—in both Essex County Correctional Facility in New Jersey ("Essex") and the Metropolitan Detention Center in Brooklyn ("MDC")—thousands of miles from his family and friends.  Due to both the expense of travel from California to New York and the ongoing COVID-19 pandemic, Mr. Harris has not received a single social visit since his arrest.  Moreover, between his arrest and May 2023, he received only two legal visits from prior counsel.

11

Making matters worse, when Mr. Harris initially arrived at Essex in November 2021, despite being a year and a half into the COVID-19 pandemic, the jail was essentially devoid of meaningful programming and enforcing frequent lockdowns.  Though Mr. Harris has managed to avoid becoming infected with COVID-19, many of his dormmates tested positive during the course of his incarceration at Essex.  Since arriving at the MDC in early November 2023, Mr. Harris has continued to face exceedingly restrictive circumstances, including frequent lockdowns and little to no programming.



████████████████████████████ █ ████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

     Mr. Harris was moved to the MDC in early November 2023.  While at the MDC, he has been subjected to extended lockdowns during which he is confined to his cell for multi-day stretches, with at most two-hour blocks in which he can leave his cell.  Mr. Harris was on lockdown for nearly three weeks at the end of December 2023.  During the rare times when he is not locked into his cell, the MDC's educational and other offerings are so paltry there is not much for Mr. Harris to do other than watch time pass by.  Additionally, Mr. Harris reports that the showers are consistently cold and the food portions insufficient.

     Despite the harsh conditions of his confinement, Mr. Harris has tried to take advantage of the limited opportunities available to him.  For example, while at Essex, Mr. Harris completed 104 courses on his jail-issued tablet and completed the one in-person substance abuse course that was offered during his time there.  *See* Ex. C (List of programs Mr. Harris completed at Essex).  Additionally, he worked as an orderly for a period of several months.  Since arriving at MDC in November 2023, Mr. Harris has inquired about working as a counselor on the suicide ward, but he was informed that the program is not currently accepting applicants.  At both institutions, Mr. Harris has also filled his time with reading, including the Bible and the newspaper daily, playing

---

[3]    Mr. Harris also spoke in person with Sergeant James about the incident, who informed Mr. Harris that if he pursued the issue he would be placed in isolation until the matter was resolved, which could be a very long time.

Sudoku, and familiarizing himself with federal criminal law so he can meaningfully participate in his own defense.

## VII.    Plea Agreement

On October 5, 2022, Mr. Harris entered into a written plea agreement with the government, pursuant to which Mr. Harris agreed to plead guilty to Count I of the indictment, 21 U.S.C. §§ 841(b)(1)(A) and 846, which carries a mandatory minimum of ten years' imprisonment.  The plea agreement stipulated, among other things, that Mr. Harris conspired to distribute and possess with intent to distribute 873.83 grams of Methamphetamine (Ice) and 7.96 grams of cocaine.  The stipulated Sentencing Guidelines range was 188 to 235 months, based on a total offense level of 35 (including a 2-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm) in Criminal History Category II.[4]

At the change of plea hearing, Mr. Harris fully admitted his conduct and accepted responsibility.  The Court accepted the plea and scheduled sentencing.

## VIII.    PSR and Probation Department Recommendation

On January 3, 2023, the Probation Department issued the PSR and sentencing recommendation.  The Probation Department found that the Sentencing Guidelines range was 292 to 365 months based on its calculations of Mr. Harris's offense level in Criminal History Category VI, because it found he was a career offender.  PSR ¶ 98.  The Probation Department calculated Mr. Harris's total offense level as 35 based on the following:

- Base offense level of 34, pursuant to U.S.S.G. § 2D1.1(a)(5), (c)(3);

---

[4]      As discussed below, since the plea agreement, we have learned of new facts that indicate that Mr. Harris belongs in Criminal History Category III; however, that category overstates the seriousness of his criminal history.

- Increase 2 levels because "a 9mm 'ghost gun' was possessed," pursuant to U.S.S.G. § 2D1.1(b)(7);

- Increase 2 levels because Mr. Harris "distributed methamphetamine through mass-marketing by means of an interactive computer service, namely the dark web," pursuant to U.S.S.G. § 2D1.1(b)(7); and

- Adjustment of 3 levels for acceptance of responsibility, pursuant to U.S.S.G. §3 E1.1(a)–(b).

PSR ¶¶ 32–43.

Probation found that Mr. Harris's total criminal history score is 8, which it calculated as follows:[5]

- 1 point for a conviction from April 3, 2017, for "Possess Marijuana for Sale" in Los Angeles County Superior Court, Perris, CA, when Mr. Harris was 25 years old, to which he was "sentenced to 3 years' probation and 90 days' imprisonment (suspended)," pursuant to U.S.S.G. §§ 4A1.1(c), 4A1.2(e)(2);

- 1 point for a conviction from December 26, 2018, for "Reckless Driving" and "DWI: 1st Offense" in Riverside County Superior Court, Pomona, CA, following from an arrest from June 18, 2017, when Mr. Harris was 25 years old, to which he was sentenced to "60 days' imprisonment (suspended) and 2 years' probation," U.S.S.G. §§ 4A1.1(c), 4A1.2(c)(1), 4A1.2(e)(2);

- 2 points for a conviction from December 24, 2018, for "Possession of Controlled Substance for Sale" in Los Angeles County Superior Court, Los Angeles, CA,

---

[5]     The references to the Sentencing Guidelines in the summary of the PSR refer to the 2021 Sentencing Guidelines, which were in effect at the time that the PSR was issued.

when Mr. Harris was 27 years old, to which he was sentenced to 60 days'
imprisonment and 3 years' probation, U.S.S.G. § 4A1.1(b), 4A1.2(e)(2);

- 0 points for a conviction from June 5, 2019, for "Distribution of a Controlled
  Drug" in Fairfax, VA, when Mr. Harris was 27 years old, to which he was
  sentenced to "5 years' imprisonment (suspended) and 2 years' probation,"
  U.S.S.G. § 4A1.2(a)(2);

- 2 points for a conviction from June 5, 2019, for "Distribution of a Controlled
  Drug" in Fairfax, VA, when Mr. Harris was 27 years old, to which he was
  sentenced to "5 years' imprisonment (4 years and 2 months suspended) and 2
  years' probation," U.S.S.G. §§ 4A1.1(b), 4A1.2(e)(2); and

- 2 points because Mr. Harris committed the instance offense while under a
  criminal justice sentence, U.S.S.G. § 4A1.1(d).

PSR ¶¶ 45–51.  With 8 criminal history category points, the PSR placed Mr. Harris in Criminal
History Category IV.  PSR ¶ 52.  The Probation Department further found that Mr. Harris is a
career offender pursuant to U.S.S.G. § 4B1.1(b) based on his convictions from December 24,
2018, and June 5, 2019, and therefore placed him in Criminal History Category VI.  PSR ¶ 53.

Mr. Harris's prior counsel did not file any objections to the PSR.  After being appointed,
the undersigned objected to the Probation Department's designation of Mr. Harris as a career
offender via letter dated August 24, 2023, sent to the government and U.S. Probation Officer
Specialist Nicolo DiMaria.  *See* Ex. D (Correspondence between counsel and USPO DiMaria).
Officer DiMaria responded that he could not "entertain objections at this juncture," and therefore
did not substantively respond to the objection.  *Id.*  The government did not respond to the
objection.

Nonetheless, the Probation Department recommends a downward variance to 144 months' imprisonment. PSR at 21. The PSR details at length the justification for its recommended downward variance, and includes among its reasons the "difficult circumstances" of Mr. Harris's upbringing, his "varied and significant history of illicit substance use," the Probation Department's view that Mr. Harris's "designation as a career offender may overstate the seriousness of his criminal history as there was no violence in past arrests," and "the fact that the defendant appeared to have been operating a business on his own, thereby possessing the ability to be employed and educated in the future." PSR at 22.

## IX.   Safety Valve Proffer and Relevant Facts Concerning the Firearm Mr. Harris Possessed

On January 4, 2024, Mr. Harris participated in a safety valve proffer at the U.S. Attorney's Office. During that meeting, Mr. Harris fully admitted to his conduct and answered the government's questions regarding his narcotics sales and his gun possession, including providing detailed information as to how his dark web narcotics business operated. He did not withhold any information. In addition, he identified information that he provided during his post-arrest interview that was either incomplete or not accurate and provided the true answers to those questions during the safety valve proffer.

Mr. Harris provided information regarding the gun that was recovered on the day of his arrest. Specifically, Mr. Harris explained that he purchased the gun out of fear for his safety in the wake of the riots in Los Angeles following the death of George Floyd over Memorial Day Weekend in the early summer of 2020. Mr. Harris was not selling drugs over the internet at the time he purchased the gun; he commenced that conduct several months later, in or about November 2020. Mr. Harris would carry the gun with him when he was out in crowded places, like clubs or restaurants, and it otherwise stayed in a safe in his apartment. By contrast, he kept

17

his drug supply in his car or at friends' houses and would package his drug shipments in motel rooms. Accordingly, from November 2020 to July 2021, although Mr. Harris was both a drug dealer (albeit over the internet) and possessed a firearm, those two activities were completely separate from one another.

After Mr. Harris opened his smoke shop in the early summer of 2021, he often would bring the gun down from his apartment to the shop and keep it there for protection in case the store got robbed. Initially, he kept the gun by the register, but after state law enforcement officials showed up unannounced to make sure that the shop had the proper tobacco licensing, he moved the gun to the storage room at the back of the store. When it was in the storage room, Mr. Harris would typically stash the gun behind the door on top of a stack of boxes. This is where it was located when Mr. Harris was arrested. His thinking was that if a robber came into the store and marched someone to the storage room to access a safe in that room which was visible from the store, that person could grab the gun to protect themselves. Mr. Harris's employees were aware of the gun's presence and location.

Although Mr. Harris also ultimately used one compartment of the two-compartment safe that was in the same storage room to store methamphetamine and cocaine, and packaged the drugs in that storage room, he did not keep the gun there to protect the drugs. As far as Mr. Harris is aware, no one knew that he sold drugs or where any drugs were located, because he exclusively sold the drugs over the internet and distributed them via mail. His employees did not have access to the safe. He never sold narcotics in person out of the smoke shop (nor did the return addresses he put on packages accurately reflect the address of the smoke shop). Similarly, Mr. Harris never brought the gun with him when conducting activities related to his narcotics

business; for example, he did not bring it with him when he purchased drugs or when he packaged them in motel rooms.

Following his proffer, the government advised that it did not believe Mr. Harris was safety valve eligible because it found his explanation that he possessed the firearm for personal protection to be "implausible."  Ex. E (Email correspondence between N. Biale and AUSA Lasky).

## ARGUMENT

A sentence of three-to-five years' imprisonment is sufficient in this case.  Ten years is far greater than necessary.  Because Mr. Harris satisfies the safety valve requirements outlined in U.S.S.G. §§ 2D1.1(b)(18) and 5C1.2 and 18 U.S.C. § 3553(f), the Court is not required to sentence him to the ten-year mandatory minimum that 18 U.S.C. § 841(b)(1)(A) carries.  For the reasons outlined below, a ten-year sentence—and certainly any sentence greater than ten years— would be unjust, and unnecessary to serve the purposes of sentencing.

## I.    Mr. Harris Properly Belongs in Criminal History Category III

The Court should reject the Probation Department's calculation of Mr. Harris's criminal history points and designation as a career offender, and instead find that the applicable Guidelines range is that which is stipulated in the plea agreement, with one exception, namely, that the disclosure of new information and promulgation of amendments to the Sentencing Guidelines that occurred after the plea agreement place Mr. Harris in Criminal History Category III.  The Probation Department incorrectly determined that Mr. Harris's prior convictions qualify as predicate offenses for purposes of U.S.S.G. § 4B1.1(a), and thus erroneously labeled him a career offender.  As a result, the Court should find that Mr. Harris belongs in Criminal History Category III, not Category VI.

A.    <u>Mr. Harris Has Fewer Criminal History Points Under Guidelines Amendment 821</u>

The recently amended Sentencing Guidelines reduce Mr. Harris's criminal history points from 8 to 6. At the time that Mr. Harris's PSR was issued, the Sentencing Guidelines required the addition of "2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." *See* U.S.S.G. § 4A1.1(d) (2021). Pursuant to the Sentencing Guidelines Amendment 821, effective as of November 1, 2023, that is no longer the case. U.S.S.G. § 4A1.1(e) now provides that "1 point" be added only "if the defendant (1) receives 7 or more points under subsections (a) through (d)," which outline how to calculate criminal history points for prior offenses, "and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." U.S.S.G. § 4A1.1(e). Accordingly, if a defendant was under a criminal justice sentence at the time he committed the instant offense but has fewer than 7 points under subsections (a) through (d), he does not receive any additional criminal history points on account of his status. Because the applicable Guidelines are those in effect at the time of sentencing, Amendment 821 governs the calculation of Mr. Harris's criminal history points. *See* U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").

Applying the Guidelines presently in effect, Mr. Harris has 6 criminal history points, placing him in Criminal History Category III. As outlined above, the January 2023 PSR calculated that Mr. Harris had 8 criminal history points. *See supra* pp. 15–16. Of those points, 6 derived from prior convictions. PSR ¶¶ 45–50. The amendments to the Sentencing Guidelines do not impact this calculation. *Compare* U.S.S.G. §§ 4A1.1(a)–(d) (2023)*, with* U.S.S.G. §§ 4A1.1(a)–(c), (e) (2021). Mr. Harris received an additional 2 points for committing the instant offense while under a criminal justice sentence. PSR ¶ 51. Because Mr. Harris receives 6

criminal points, *i.e.*, fewer than 7 points, under Sections 4A1.1(a)–(d), he now receives no additional points due to his status at the time of the offense.  *See* U.S.S.G. § 4A1.1(e). Accordingly, Mr. Harris's criminal history points total up to 6, placing him in Criminal History Category III.

       B.    <u>Mr. Harris Does Not Qualify as a Career Offender</u>

The PSR incorrectly categorizes Mr. Harris as a career offender pursuant to § 4B1.1(a). *See* PSR ¶¶ 40, 53.  Because the two prior felony convictions on which the PSR relies do not qualify as "controlled substance offenses" for purposes of § 4B1.1, Mr. Harris is not a career offender, and his Guidelines should not reflect the enhanced criminal history category and offense level that a career offender designation would trigger.

Section 4B1.1(a) renders a defendant a "career offender" if "(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and," as relevant here, "(3) the defendant has at least two prior felony convictions of . . . a controlled substance offense."  U.S.S.G. § 4B1.1(a).  As a result of being deemed a career offender, a defendant may be subjected to a heightened offense level than his conduct otherwise dictates for purposes of calculating his Guidelines sentence.  *See* U.S.S.G. §§ 4B1.1(b)–(c).

In *United States v. Townsend*, 897 F.3d 66, 72–73 (2d Cir. 2018), the Second Circuit outlined the framework for determining whether a defendant's prior state conviction qualifies as a predicate prior felony conviction for purposes of Section 4B1.1(a)(3).  First, a court must determine whether the statute for the predicate offense is "indivisible" or "divisible."  An indivisible statute "defines only one crime.  It may list 'various factual means of committing a

single element,' but it does not list the elements in the alternative." *Id.* at 73 (quoting *United States v. Jones*, 878 F.3d 10, 16 (2d Cir. 2017)).  A divisible statute, on the other hand, "lists elements in the alternative, thereby defining multiple crimes within one statute." *Id.*  Whether or not a statute is divisible determines how the court conducts the career offender analysis—"[a]n indivisible statute is subject to the categorical approach," whereas a "divisible statute triggers the modified categorical approach." *Id.*  Under the categorical approach, "courts look only at the language of the statute"; whereas under the modified categorical approach, courts "consider a very limited set of materials to help determine the specific elements of the crime of conviction" because "courts do not know by looking only at the text of the statute which alternative version the defendant may have violated." *Id.*  "Once courts determine the particular elements of the crime of conviction, the analysis is the same for both approaches":  "[i]f the elements of the defendant's prior state conviction are the same as, or narrower than, the generic federal counterpart for that crime, the prior state conviction can affect the defendant's Guidelines range under" § 4B1.1, but, if the state statute "punishes conduct not criminalized by federal law," the conviction "cannot affect the Guidelines calculation." *Id.*

Applying *Townsend* to Mr. Harris's Virginia and California state convictions demonstrates that they do not qualify as predicate controlled substance offenses.  In making its career offender determination, the PSR relies on a June 5, 2019, Virginia state conviction for distribution of a controlled drug and a December 24, 2018, California state conviction for possession of a controlled substance for sale.  *See* PSR ¶¶ 40, 47–49, 53.  Both of the relevant statutes are indivisible, however, and both states include on their controlled substance lists substances not included on the federal counterpart.  Accordingly, the statutes criminalize conduct

22

not criminalized under federal law, and Mr. Harris's convictions, therefore, cannot serve as predicate offenses for purposes of the career offender analysis.

Mr. Harris's Virigina convictions were for violations of Virginia Code § 18.2-248.[6]  *See* PSR ¶ 48–49; Plea Agreement at 3.  Section 18.2-248(A) provides: "it shall be unlawful for any person to manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance."  Although the Fourth Circuit has "held that Section 18.2-248 is divisible by *prohibited substance*," *United States v. Wysinger*, 64 F.4th 207, 217 (4th Cir. 2023) (emphasis added), in the Second Circuit, the fact that a statute may be violated through various substances does *not* render it divisible, *see, e.g.*, *Townsend*, 897 F.3d at 74 (deciding that N.Y.P.L. § 220.31, which requires a defendant possess "a 'controlled substance' generally," is indivisible because the "particular controlled substance a defendant actually possessed is not an element . . . and need not be proven for a defendant to be convicted").  Because § 18.2-248 is not divisible in any other way, *i.e.*, it does not otherwise list elements in the alternative, it is indivisible.  As such, the categorical approach applies.  *Id.* at 73. Comparing Virginia's list of controlled substances to the federal counterpart reveals that Virginia includes at least one substance, Salvinorin A, that the federal list does not.  *Compare* Va. Code § 54.1-3446(3)*, with* 21 U.S.C. § 812.  Accordingly, Mr. Harris's Virginia convictions do not qualify as a predicate offense for purposes of determining whether he is a career offender.

Likewise, Mr. Harris's 2018 California conviction, PSR ¶ 47, does not qualify as a predicate offense for purposes of § 4B1.1.  Mr. Harris was convicted for violating California

---

[6]     For the same reason that Mr. Harris's two Virginia convictions count as one conviction for purposes of calculating his criminal history points, they also count as a single conviction for purposes of determining whether Mr. Harris qualifies as a career offender.  *See* U.S.S.G. § 4B1.2, cmt. n.3 ("The provisions of §4A1.2 (Definitions and Instructions for Computing Criminal History) are applicable to the counting of convictions under §4B1.1.").

Health and Safety Code § 11378 ("HS 11378").  For the same reason that § 18.2-248 is indivisible, HS 11378 is also indivisible.  HS 11378 provides that "a person who possesses for sale a controlled substance that meets any of the following criteria shall be punished by imprisonment pursuant to Subdivision (h) of Section 1170 of the penal code," and it identifies as the relevant substances by reference certain sections of the California Code.  As the Fourth Circuit has held with respect to § 18.2-248, the Ninth Circuit has held that HS 11378's "controlled-substance requirement is divisible." *United States v. Renteria-Aguilar*, 766 F. App'x 557, 559 (9th Cir. 2019) (citing *United States v. Ocampo-Estrada*, 873 F.3d 661, 668–69 (9th Cir. 2017)).  But there is no basis other than the type of controlled substance on which HS 11378 can be considered divisible.  Thus, for the same reason explained above, because the Second Circuit has held statutes that may be violated through numerous substances to be indivisible, under that controlling authority HS 11378 is indivisible and the categorical approach applies. Because California's list of controlled substances includes those outside the scope of the federal list, *see, e.g.*, *United States v. Valdavinos-Torres*, 704 F.3d 679, 684 (9th Cir. 2012); *United States v. Sanchez-Garcia*, 642 F.3d 658, 661–62 (8th Cir. 2011); *United States v. Lopez-Cano*, 516 F. App'x 350, 353 (5th Cir. 2013); *United States v. Perez*, 325 F. Supp. 3d 1058, 1060–61 (N.D. Cal. 2018) (explaining "prior § 11378 convictions are not controlled substances for purposes of determining whether [the defendant] qualifies as a career offender under the Sentencing Guidelines" because California's definition of methamphetamine is not divisible and is facially broader than the federal definition), Mr. Harris's conviction for violating HS 11378 cannot serve as a predicate offense for purposes of § 4B1.1.  Accordingly, Mr. Harris is not a career offender pursuant to § 4B1.1.

Even if HS 11378 were divisible, triggering the modified categorical approach, Mr. Harris's offense could not serve as a predicate offense because neither the PSR nor any other document identifies what illicit substance was involved in the offense. Although the PSR notes that "[c]ourt records confirm the disposition and sentence imposed," it does not attach those records or provide any specifics. *See* PSR ¶ 47 ("Police records were requested but a response has not been received. Court records confirm the disposition and sentence imposed. A request for probation records was sent, but a response has not been received."). Absent the availability of a document approved for use in the modified categorical approach, a sentencing court cannot find that a prior offense for an unspecified substance counts as a predicate offense for purposes of finding a defendant to be a career offender. *See United States v. Smith*, Crim. No. 3:21cr202 (JBA), 2023 WL 1350271, at *3 (D. Conn. Jan. 31, 2023) (declining to find prior offense was a predicate controlled substance offense where only the PSR and no "judicially approved document" identified the "narcotic substance" of which the defendant was previously convicted of possessing with intent to sell or distribute); *Ocampo-Estrada*, 873 F.3d at 668–70 (finding defendant's prior HS 11378 conviction did not qualify as a predicate offense under Section 4B1.1 because the government failed to offer a document within the "limited class of documents" from the "record of the prior conviction" that established the controlled substance relevant to that offense).

C.    <u>Mr. Harris's Criminal History Category Overstates the Seriousness of His Criminal History</u>

For the foregoing reasons, the correct Criminal History Category is III. That category, however, overstates the seriousness of Mr. Harris's criminal history. Of Mr. Harris's six criminal history points, four points stem from two states prosecuting him for the same conduct; namely, Mr. Harris was indicted in Virginia for selling narcotics to a buyer in that state over the

internet (using essentially the same method he used in the instant offense).  California authorities executed an arrest warrant on behalf of Virginia in 2018 and, unsurprisingly, found narcotics and paraphernalia for packaging it in Mr. Harris's possession.  California then also prosecuted Mr. Harris for possession of a controlled substance for sale, and he served time in custody in California while awaiting extradition to Virginia.  In other words, Mr. Harris's 2019 Virginia convictions and his 2018 California convictions are for the same conduct.  His two other points stem from relatively minor offenses:  Possession of marijuana for sale (now a misdemeanor in California) and one reckless driving/first DWI offense.

To be clear, we and Mr. Harris acknowledge that he was previously convicted and incarcerated of committing essentially the exact same offense as in this case—selling narcotics over the internet.  Given that, a sentence substantially higher than the ten months he previously served is undoubtedly warranted (and he has already served more than two-and-a-half times that amount).  But an increase from ten months to ten *years* (a twelve-fold jump) is an extreme—and greater than necessary—escalation in punishment for a second serious offense, especially for an individual with Mr. Harris's substance abuse history and potential for productive contribution to society.

## II.   Mr. Harris Satisfies the Requirements of 18 U.S.C. § 3553(f) and Is Eligible for Safety Valve Relief

The Court is not bound by the ten-year mandatory minimum imposed by 21 U.S.C. § 841(b)(1)(A) because Mr. Harris satisfies the "safety valve" requirements outlined in 18 U.S.C. § 3553(f).  We recognize this is unusual in a case where the defendant possessed a firearm, ordinarily a barrier to safety valve relief.  But here, based on the unique circumstances of when and why Mr. Harris obtained the firearm, how he stored it, and the specific nature of his narcotics business, a preponderance of the evidence supports application of the safety valve.

26

A.    Legal Standard

Section 3553(f) provides that a court "shall impose a sentence . . . without regard to any statutory mandatory minimum sentence, if the court finds at sentencing, after the government has been afforded to make a recommendation that" the following criteria are satisfied:

> (1) the defendant does not have—(A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines; (B) a prior 3-point offense, as determined under the sentencing guidelines; and (C) a prior 2-point violent offense, as determined under the sentencing guidelines;

> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

> (3) the offense did not result in the death or serious bodily injury to any person;

> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f).  The Sentencing Guidelines incorporate the safety valve and state that a defendant who satisfies all five criteria is entitled to a two-level reduction to his or her offense level.  U.S.S.G. §§ 5C1.2, 2D1.1(b)(18).

The defendant bears the burden to prove safety valve entitlement by a preponderance of the evidence.  *United States v. Jimenez*, 451 F.3d 97, 102 (2d Cir. 2006).  "[W]hen the defendant makes an initial submission that appears credible and complete, the Government cannot carry the day by simply telling the district court that *it* does not believe the defendant or by inviting the

district court to indulge in speculation." *United States v. Collins*, 924 F.3d 436, 444 (7th Cir. 2019).  Rather, "[t]he Government can hope to rebut the defendant's credible showing only by giving the district court a concrete, fact-based rationale for rejecting the defendant's case." *Id.*; *see also United States v. Miller*, 179 F.3d 961, 968–69 (5th Cir. 1999) (holding district court improperly found defendant ineligible for safety valve relief where the government's challenge to defendant's truthfulness was "speculation"); *United States v. Miranda-Santiago*, 96 F.3d 517, 529 (1st Cir. 1996) (vacating district court's denial of safety valve relief on grounds that such determination was improperly based on "mere conjecture").

        B.      <u>Mr. Harris Satisfies All the Requirements for Safety Valve Eligibility</u>

Mr. Harris satisfies all five criteria by at least a preponderance of the evidence and is therefore entitled to safety valve relief.  The government has advised us that it will argue that Mr. Harris does not satisfy safety valve criteria (2) and (5) because, respectively, it contends that Mr. Harris possessed a firearm in connection with the offense and it does not believe he was truthful about that fact during his proffer.  The government is wrong.  For the following reasons, Mr. Harris qualifies for safety valve relief.

        i.      *Mr. Harris Indisputably Satisfies Three of the Five Eligibility Criteria*

The government does not dispute that Mr. Harris satisfies the criteria outlined in 18 U.S.C. §§ 3553(f)(1), (3), and (4).  It is undisputed that he satisfies criteria (3) and (4) because the offense did not result in the death or serious bodily injury to any person and Mr. Harris was not an organizer, leader, manager, or supervisor in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise.

It is also undisputed that Mr. Harris satisfies criterion (1), the maximum criminal history points requirement.  As explained above, Mr. Harris has one 0-point conviction, two 1-point

convictions, and two 2-point convictions; although the PSR assigns Mr. Harris two additional criminal history points related to his status at the time of his arrest, those points no longer apply under the currently operative Sentencing Guidelines.  *See supra* pp. 20–21.  Disregarding Mr. Harris's 1-point convictions, as Section 3553(f)(1)(A) instructs, and the no longer applicable status points, Mr. Harris has four criminal history points and thus satisfies the requirement.  He does not have any 3-point offenses nor any 2-point violent offenses.  For these reasons, Mr. Harris satisfies the first requirement for safety valve eligibility.

> ii.      *Mr. Harris Did Not Possess a Firearm "in Connection" with His Offense*

Mr. Harris satisfies 18 U.S.C. § 3553(f)(2) because he "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense."  The Second Circuit has held that the "'in connection with the offense' language of § 5C1.2(2) is equivalent to the 'in relation to' language of 18 U.S.C. § 924(c)(1)."  *United States v. DeJesus*, 219 F.3d 117, 122 (2d Cir. 2000).  Consistent with caselaw interpreting that statute, for a firearm to be used "in connection with the offense" for purposes of 18 U.S.C. § 3553(f)(2), it "must have some purpose or effect with respect to the drug trafficking crime" and "at least must facilitate, or have the potential of facilitating, the drug trafficking offense."  *Smith v. United States*, 508 U.S. 223, 238 (1993).  Accordingly, the government cannot rebut safety valve eligibility by relying on the generalization that "any time a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs."  *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006).  In the same vein, the Eleventh Circuit has explained that "a defendant seeking safety valve relief may demonstrate that despite [close] proximity [of a firearm to drugs], there was no connection between the firearm and his drug offense."  *United States v. Myrie*, 753 F. App'x

855, 859 (11th Cir. 2018) (citing *United States v. Carillo-Ayala*, 713 F.3d 82, 92 (11th Cir. 2013)).  In other words, "the mere presence of a weapon at the scene of a drug crime, without more, is insufficient to prove that the gun was possessed 'in furtherance of' the drug crime." *Snow*, 462 F.3d at 62; *see also Smith*, 508 U.S. at 238 (explaining that the weapon's "presence or involvement cannot be the result of accident or coincidence").

A preponderance of the evidence supports Mr. Harris's contention that he did not possess a firearm in connection with his narcotics offense.  As Mr. Harris has credibly and consistently stated, he purchased the gun for reasons wholly unrelated to his narcotics offense and prior to his offense conduct, never carried or used it during the purchase or sale of narcotics, and never used it to protect his narcotics.  *See supra* pp. 17–19.  Rather, in the wake of the extreme civil unrest in Los Angeles following the protests responding to the murder of George Floyd – circumstances involving riots, looting, arson, and vandalism[7] – Mr. Harris purchased a gun for personal safety in the summer of 2020.  At that time, he was not selling drugs over the internet or otherwise.  He carried the gun with him only when he went to crowded places that he feared might get unruly, like clubs, bars, and restaurants, and otherwise kept it in a safe in his bedroom.  Several months later, Mr. Harris began selling methamphetamine and cocaine over the internet; however, he stored the drugs in his car or at friends' houses—not in his own apartment—and he packaged the drugs in motel rooms.  He did not bring the gun when he purchased the narcotics, nor when he packaged them.

---

[7]     Associated Press, *56 Suspects Arrested After Systemic Looting and Theft During George Floyd Protests in California*, ABC 7 (August 27, 2020), https://abc7.com/looting-protests-in-los-angeles-george-floyd-black-lives-matter/6391666/; *Images: Violence Flares Up on the Streets of Los Angeles*, NBC Los Angeles (June 8, 2020, 11:40 a.m.), https://www.nbclosangeles.com/news/local/george-floyd-protest-los-angeles-police-lapd/2370927/.

After Mr. Harris opened his smoke shop, approximately one year after he purchased the gun, he began storing it there during its operating hours to protect the shop from potential robbery. Wanting to use the gun only in the direst circumstances (and out of fear of a police officer seeing it given his felony record), Mr. Harris generally kept the gun in the back storage room in arm's reach of the door, either on top of or wedged in between papers. His thinking was that if someone was so bold as to force him or an employee to the backroom, rather than merely demand the relatively small amount of money in the register, the gun would be on hand—with a quick reach around the door—for self-protection. The storage room also contained backstock for the store, as well as a safe that held in one locked compartment money from the store and, in a separate compartment, his drugs, and he packaged drugs in that room, typically when the store was closed.

After Mr. Harris began selling drugs online in the late fall of 2020, he never used the gun during or in connection with any of his offense conduct. Considering that the bulk of Mr. Harris's illegal activity happened while he was sitting alone, either behind a computer or while packaging drugs, this is not surprising. Mr. Harris had no need to fear that someone would seek him out in person in connection with his drug business because no one knew who he was or where he was. His address was not included in his online postings or on the packages he mailed out. He never interacted directly with his customers or met them in person. No one knew when or where he was packaging the drugs. He purchased drugs from serious suppliers, who he did not fear would attempt to rob him. That Mr. Harris's gun was in the same room where he stored and packaged the drugs—which he was not doing at the time of his arrest—is a function of the fact that he did so in his store, which he wanted to protect. The government has not pointed to any evidence to the contrary (and there is none). Instead, the government has advised only that it

31

finds Mr. Harris's explanation for why he had the gun "implausible." Ex. E (Email correspondence between N. Biale and AUSA Lasky). That is not enough to rebut the credible statements given by Mr. Harris, supported by other facts in the record, that the firearm was purchased and possessed for personal protection unrelated to any narcotics activity. *See, e.g.*, *Miranda-Santiago*, 96 F.3d at 528–29 (holding district court erred in finding defendant ineligible for safety valve relief based on the government's assertion that, based on facts that could "be 'gleaned' from the PSR," the defendant "failed honestly to disclose her own participation in the conspiracy").

That Mr. Harris stipulated in the plea agreement to application of the enhancement for possession of a firearm pursuant to Section 2D1.1(b)(1) does not preclude the Court from finding Mr. Harris safety valve eligible. At least seven circuits have held that a firearm enhancement pursuant to Section 2D1.1(b)(1) does not foreclose a safety valve reduction. *See, e.g.*, *United States v. Bingham*, --- F.4th ---, 2023 WL 8722172, at *2–3 (7th Cir. Dec. 19, 2023); *United States v. Bolton*, 858 F.3d 905, 913–14 (4th Cir. 2017); *Carillo-Ayala*, 713 F.3d at 91; *United States v. Anderson*, 452 F.3d 87, 90 (1st Cir. 2006); *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1188 (10th Cir. 2004); *United States v. Bolka*, 355 F.3d 909, 914 (6th Cir. 2004); *United States v. Nelson*, 222 F.3d 545, 549–51 (9th Cir. 2000). "These holdings are based on the different standards of proof applicable to, on one hand, overcome a § 2D1.1(b)(1) firearm enhancement, and on the other hand, satisfy § 5C1.2(a)(2) to obtain a safety valve reduction." *Bolton*, 858 F.3d at 914. Specifically, "[w]hereas a defendant may be unable to show that any connection between a firearm and an offense is 'clearly improbable,' the same defendant might be able to prove 'by a preponderance of the evidence' that the firearm was not connected with the offense to satisfy § 5C1.2(a)(2)." *Id.*; *see also* U.S.S.G. § 2D1.1, cmt. n.11(A) ("The

enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.").  Here, the Court should find that even if it is not "clearly improbable" that the firearm was possessed in connection with the offense, Mr. Harris has nonetheless carried his burden of establishing by a preponderance that it was not.

Persuasive authority supports the application of the safety valve despite the application of the weapon enhancement, in light of Mr. Harris's credible explanation for the presence of a gun at the time of his arrest.  In *United States v. Stamps*, 983 F.3d 945 (7th Cir. 2020), the Seventh Circuit held that the trial court erred in applying the "clearly improbable" standard associated with Section 2D1.1(b)(1) to the safety valve analysis.  *Id.* at 950.  When vacating the district court's decision that the defendant was not safety valve eligible, the Seventh Circuit pointed to certain details in the defendant's explanation for his gun possession that suggested a court might find him safety valve eligible under a preponderance standard.  Specifically, among other factors, the court highlighted that "Stamps provided a non-drug related reason for owning the gun," "argued that he conducted all of his drug deals outside of his home, none of his customers knew where he lived, and he never carried the gun with him to drug transactions."  *Id.*  That the firearms and the drugs were stored in the same apartment was "not dispositive."  *Id.*  On remand, the defendant was sentenced below the statutory mandatory minimum, indicating that, on these facts, the court ultimately found Mr. Stamps to be safety valve eligible despite his gun possession.[8]

Similarly, in *United States v. Anderson*, the First Circuit held that safety valve eligibility and a firearm enhancement were not mutually exclusive.  452 F.3d at 90.  In *Anderson*, the

---

[8]    There is no sentencing transcript available or written opinion on the docket explaining the reasons why, on remand, the sentencing court deemed the defendant safety valve eligible.

government agreed with the Probation Department's recommendation and the court held that a defendant was safety valve eligible where the agents "seized a loaded Smith and Wesson 9mm semi-automatic handgun, found in the [defendant's] living room along with a ledger recording money owed to [defendant]," and also seized from his home "several baggies" containing cocaine. *Id.* at 88. The defendant explained in his proffer that he purchased the firearm "as personal protection after a series of armed home invasions" in the area. *Id.* at 89. When explaining its basis for agreeing that the defendant was eligible for safety valve relief, the government stated it "would have to provide the court with some evidence that the gun was used in connection with the offense," and it had "no such evidence." *Id.* The First Circuit held that, based on the different standards of proof for the safety valve reduction and the weapon enhancement, the district court correctly applied both under these circumstances. *Id.* at 90; *see also Nelson*, 222 F.3d at 551 (remanding for consideration of whether defendant established safety valve eligibility by preponderance of the evidence despite finding that it was "clearly improbable" that weapons were not possessed in connection with narcotics offense, where defendant asserted that handguns he owned were "collectors' pieces" unrelated to his marijuana grow operation).

Like the defendants in *Stamps* and *Anderson*, Mr. Harris's firearm possession was wholly separate from his conduct relating to his drug offense, and the government has supplied no evidence to the contrary. Accordingly, Mr. Harris satisfies the requirement that he did not possess a firearm "in connection with the offense."

       iii.    *Mr. Harris Provided Truthful and Complete Information to the Government During the Proffer*

Finally, Mr. Harris "has truthfully provided to the Government all information and evidence" that he has concerning his offense conduct, and thus satisfies criterion (5) of the safety

valve.  Immediately after his arrest, Mr. Harris spoke with the arresting agents for nearly two hours, during which time he answered their questions and provided access to his devices and the applications on those devices.  In addition, as described above, Mr. Harris participated in a formal safety valve proffer with the government on January 4, 2024.  *See supra* pp. 17–19. During that meeting, which spanned nearly three hours, Mr. Harris answered all questions regarding his offense conduct and the gun truthfully, and he corrected any misinformation that he provided during his post-arrest interview.

The government has indicated that the portion of Mr. Harris's proffer that it found untruthful relates only to his reasons for possessing the firearm, based on the government's view that it is "implausible" that the firearm was not connected to his narcotics business.  Ex. E (Email correspondence between N. Biale and AUSA Lasky).  As discussed above, because Mr. Harris's explanation is "credible and complete," the government may rebut that showing "only by giving the district court a concrete, fact-based rationale for rejecting the defendant's case."  *Collins*, 924 F.3d at 444.  Simply casting doubt on his explanation is insufficient.  In any event, the facts here indicate that Mr. Harris's explanation for his possession of the firearm—his perceived need for personal protection—is inherently plausible.  Moreover, the timing of his purchase of the firearm and the fact that all of his narcotics sales were conducted by computer and by mail—rather than in person—further support his explanation that the firearm was not connected to narcotics trafficking.

For all of these reasons, we respectfully request that the Court find that Mr. Harris

satisfies the Section 3553(f) requirements and sentence Mr. Harris without regard for the ten-

year mandatory minimum set forth in 21 U.S.C. § 841(b)(1)(A).[9]

## III.     The Court Should Vary Downward from the Sentencing Guidelines Range

Although the Court must calculate and consider the Guidelines, here there are ample

reasons to reject categorically the Guidelines' recommended treatment of methamphetamine,

which is based on the blunt metric of drug weight and incorporates an unfounded 10:1 ratio

between quantities of methamphetamine (actual) and methamphetamine (mixture).[10]  Sentencing

courts may impose sentences that vary from Guidelines based on a policy disagreement with the

Guidelines.  *United States v. Diaz*, No. 11-CR-00821-2 (JG), 2013 WL 322243, at *3 & n.9

(E.D.N.Y. Jan. 28, 2023) (collecting cases).  Numerous courts have stated such a policy

disagreement with the methamphetamine Guidelines in particular and have varied accordingly.[11]

This Court should do the same for the following reasons:

---

[9]      While the Sentencing Guidelines provide for a 2-level reduction to the offense level for a defendant that qualifies for safety valve eligibility, *see* U.S.S.G. §§ 5C1.2 and 2D1.1(b)(18), we stand by the stipulated total offense level in the plea agreement.

[10]      Mr. Harris's plea agreement stipulates that his offense involved methamphetamine (ice), not methamphetamine (actual).  Because the Sentencing Guidelines treat methamphetamine (actual) and methamphetamine (ice) identically, *see* U.S.S.G. § 2D1.1(c), the arguments herein that refer to methamphetamine (actual) apply with equal force to Mr. Harris's sentencing.

[11]      *See, e.g.*, *United States v. Bean*, 371 F. Supp. 3d 46, 50–51 & n.3 (D.N.H. 2019) (collecting cases); *United States v. Hayes*, 948 F. Supp. 2d 1009, 1031–33 (N.D. Iowa 2013); *United States v. Johnson*, 379 F. Supp. 3d 1213, 1227 (N.D. Ala. 2019); *United States v. Saldana*, No. 1:17-cr-271-1, 2018 U.S. Dist. LEXIS 110790, at *7–11 (W.D. Mich. July 3, 2018); *United States v. Hoover*, No. 4:17-CR-327-BLW, 2018 WL 5924500, at *4 (D. Idaho Nov. 13, 2018); *United States v. Ferguson*, No. CR 17-204 (JRT/BRT), 2018 WL 3682509, at *2–4 (D. Minn. Aug. 2, 2018); *United States v. Harry*, 313 F. Supp. 3d 969, 974 (N.D. Iowa 2018); *United States v. Nawanna*, 321 F. Supp. 3d 943, 955 (N.D. Iowa 2018); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1256 (D.N.M. 2017).

*First*, the methamphetamine Guidelines are not grounded in empirical data.  As the Supreme Court has explained, "[t]he Commission did not use th[e] empirical approach in developing the Guidelines sentences for drug-trafficking offenses."  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007).  Instead, it relied on a "weight-driven scheme," *id.*, "key[ing] the Guidelines to the statutory mandatory minimum sentences that Congress established for [drug offenses]," *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007).  Where the Guidelines do not flow from the Commission's exercise of its institutional role, *i.e.*, reliance on empirical studies and data, the Guidelines deserve less deference.  *Kimbrough*, 552 U.S. at 109–10.  Like the drug Guidelines in general, the methamphetamine "Guidelines have evolved through a series of amendments over the years," based on legislative directives not scientific developments, and "the penalties . . .  have increased dramatically."  *Hayes*, 948 F. Supp. 2d at 1022–27.

*Second*, nothing justifies the 10:1 ratio the Guidelines set between methamphetamine (actual) and methamphetamine (mixture)— "there is no support in the legislative history to explain the formula underlying greater methamphetamine purity to greater months of imprisonment."  *Hayes*, 948 F. Supp. 2d at 1025; *see also Harry*, 313 F. Supp. 3d at 972–73; *United States v. Hartle*, No. 4:16-cv-00233-BLW, 2017 WL 2608221, at *2 (D. Idaho June 15, 2017).  The Guidelines treat one gram of methamphetamine (actual) as the equivalent of ten grams of methamphetamine (mixture), triggering Guideline sentences that are tenfold greater for offenses involving methamphetamine (actual) than those involving methamphetamine (mixture).  *See Johnson*, 379 F. Supp. 3d at 1223 (citing U.S.S.G. § 2D1.1(c)(13)).  The commentary seeks to justify the particular harshness of the methamphetamine (actual) guidelines by reasoning that purity "is probative of the defendant's role or position in the chain of distribution": "Since controlled substances are often diluted and combined with other substances as they pass down

37

the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1, cmt. n.27(C). This assumption, however, "is divorced from current market reality." *Bean*, 371 F. Supp. 3d at 52. Whereas "[b]etween the 1980s and 2007, the average purity of methamphetamine fluctuated between approximately 30% and 80%," perhaps reflecting proximity to source, purity is consistently higher in recent years. *Id.* "In its 2018 National Drug Threat Assessment, the Drug Enforcement Administration found that the average purity of methamphetamine between 2012 and 2017 was *over 90%*," and even higher (96.9%) in 2017. *Id.* (emphasis added); *see also Hartle*, 2017 WL 2608221, at *2 ("A recent 2015–16 survey of drug purity levels in the District of Idaho revealed an average purity level of 92.6% with a low of 88% and a high of 100%."). As a result, "the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true." *Bean*, 371 F. Supp. 3d at 53. Purity is not a proxy for culpability.

*Third*, methamphetamine Guidelines create unwarranted sentencing disparities between methamphetamine offenses and offenses involving other major drugs. "The guidelines' higher base offense levels for actual methamphetamine combined with the ubiquity of high purity methamphetamine in the market result in more severe sentences for methamphetamine offenders" than other drug trafficking offenders. *Id.* For example, "500 grams of actual methamphetamine earns a base offense level of 34, while the same quantities of other drugs result in lower base offense levels: fentanyl (30), cocaine base (crack) (30), heroin (26), and cocaine (24)." *Id.* (citing U.S.S.G. § 2D1.1(c)). With these disparities in base offense levels come unwarranted disparities in Guidelines ranges. *Id.* at 54.

For these reasons, the Court should reject the weight-driven 10:1 disparity between methamphetamine (actual) and methamphetamine (mixture).  Rather than apply the Guidelines generated by methamphetamine (actual), it should take the three-step approach that other courts have adopted: "(1) calculate the guidelines sentencing range using the purity-driven methamphetamine guidelines; (2) recalculate the guidelines using the base offense level for the same quantity of methamphetamine mixture; and (3) evaluate whether any upward or downward variances are appropriate based upon the individual characteristics of the defendant and the other § 3553(a) factors."  *Id.* at 55–56; *accord Harry*, 313 F. Supp. 3d at 974 (applying same methodology to implement policy disagreement with methamphetamine guidelines); *Saldana*, 2018 U.S. Dist. LEXIS 110790, at *11 (same); *see also United States v. Gully*, 619 F. Supp. 2d 633, 644 – 45 (N.D. Iowa 2009) (applying same methodology to implement policy disagreement with crack-powder cocaine guidelines disparity).  Applying this methodology, Mr. Harris's total offense level under the purity-driven Guideline is 35, while his total offense level under the mixture Guideline is 31.[12]  And additional factors regarding Mr. Harris individually warrant an additional downward variance, as described below.

## IV.    The § 3553 Factors Warrant a Sentence of Three to Five Years

On behalf of Mr. Harris, we respectfully request that the Court sentence him to three-to-five years' imprisonment.  This sentence is sufficient, but not greater than necessary, pursuant to

---

[12]    The plea agreement stipulates that Mr. Harris's conviction relates to 873.83 grams of methamphetamine (ice) and 7.96 grams of cocaine.  Using the methamphetamine (mixture) instead, the applicable converted drug weight for the methamphetamine is 1,747,660 grams, or 1,747.66 kilograms.  U.S.S.G. § 2D1.1, cmt. n.8(D).  The converted drug weight for the cocaine is 1,592 grams, or 1.9 kilograms.  *Id.*  Together, these amount to a total converted drug weight of 1,749,525 grams, or 1,749.25 kilograms, which correlates to an offense level of 30.  U.S.S.G. § 2D1.1(C)(5) and cmt. n.8(B).  Four points are added pursuant to U.S.S.G. §§ 2D1.1(b)(1) and (b)(7), and three points are subtracted for Mr. Harris's acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a) and (b), resulting in a total offense level of 31.  *See supra* p. 15.

18 U.S.C. § 3553(a). If the Court finds that Mr. Harris is not eligible for safety valve relief, we respectfully submit that he should receive a sentence that does not exceed the mandatory minimum of ten years.

A.    <u>Legal Standard</u>

District courts have an "overarching duty to 'impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)). Section 3553(a) sets forth these purposes:

> [T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, . . . to afford adequate deterrence to criminal conduct; . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Though a sentencing court must consider the "kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [Sentencing Guidelines]," *id.* § 3553(a)(4), "calculating the correct Guideline range [is] just an initial step in the sentencing process." *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014) (summary order) (citation and internal quotation marks omitted). A "district court may not presume that a [g]uideline sentence is reasonable." *Id.* (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). Rather, the court must "make an individualized assessment based on the facts presented." *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (quoting *Gall*, 552 U.S. at 50).

Thus, in addition to the Guidelines, courts are also required to consider a variety of other factors set forth in § 3553(a), including the "nature and circumstances of the offense" and the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Indeed, the Supreme

Court has "emphasized that highly relevant—if not *essential*—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 487–88 (emphasis added) (citations, alterations, and quotation marks omitted). "In deciding what sentence will be sufficient, but not greater than necessary to further the goals of punishment, a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks and citation omitted).

B.    Mr. Harris's Personal History and Characteristics Warrant a Sentence of Three Years' Imprisonment

Starting in childhood and up until his arrest, Mr. Harris struggled with a severe substance abuse problem spawned in large part by abandonment by the man he believed to be his father and by the lack of support he received for learning disabilities and mental health needs. For the most part, through all of his struggles, he remained an upbeat and reliable friend and family member, known for helping those in need and bringing a smile to people's faces. His friends and family remain committed to him and his rehabilitation.

i.    *Mr. Harris's Background and the Circumstances of His Childhood Place His Life Choices in Context*

Mr. Harris's difficult childhood, in particular the acute absence of a father figure and the significant substance abuse issues that absence triggered, do not excuse—but nonetheless contextualize and explain—Mr. Harris's illegal conduct. Ever since Mr. Harris was sent to live in Tennessee with a physically abusive man (who turned out not to be his father) and a woman who loathed him, Mr. Harris has been looking for a quick fix to solve his problems. While in Tennessee, Mr. Harris believed that if only he could get back to California, life would be better—no beatings, no evil stepmother; instead, in California, he imagined his mother would

have a job that allowed her to provide for and spend more time with him.  But when Mr. Harris

returned, California was far from the idealized vision he imagined.  Although life was calm and

stable with his mother and grandmother, he suddenly had no father.  He was angry, sad,

confused, and lost.  At twelve years old, he thought marijuana would provide the quick fix he

needed.  He hoped it would distract him from the pain of finding out Mr. Edmundson was not his

father, the resentment he felt towards his mother, the challenges posed by his untreated ADHD

and anxiety, and the jealousy that swelled when he saw the clothing, video games, and other

things his peers had that his mother could not afford.  Ex. A (Letter of Christopher Harris).

Marijuana provided an emotional balm, but it did not solve Mr. Harris's problems.  It did

the opposite.  Mr. Harris launched into a nearly twenty-year drug addiction involving marijuana,

Xanax, Oxycodone, alcohol, cocaine, and Lean, which undeniably clouded his judgment and still

left him feeling broken.  Mr. Harris thought that money could solve his lingering problems.

Deep into his own addiction, Mr. Harris decided to start selling drugs over the internet, both to

fuel his habit and a lifestyle that he thought would bring fulfillment and fill the void he felt at the

core of his life.  *Id.*

Although Mr. Harris's problems with substances reach back to his adolescence, in the

years leading up to this offense, his drug use – in particular, Lean – was out of control.  Mr.

Harris's friends and family note the negative effect that his drug use had on him, including that

the drugs "changed" him, Ex. B (Letter of Cecilio Quintero), such that "[h]e was not the

energetic, charismatic, and fun-loving friend" he had previously been, Ex. B (Letter of Keith

Goins Jr.).  Sober for the longest time since his adolescence, Mr. Harris now also recognizes the

harmful impact that his drug use had on his life.  During the therapy sessions he attended in the

eight months leading up to his arrest, Mr. Harris was beginning to understand how experiences in

his childhood led him to drugs and how those drugs were negatively impacting him and his relationships; for example, by leading him to make bad decisions, making him irritable, and driving his need (and, by his own admission, greed) for money.  Ex. A (Letter of Christopher Harris).

While incarcerated, Mr. Harris has continued the hard work of trying to unpack the causes of his addiction and heal from those causes as well as from the addiction itself.  He has done so through participation in the one in-person substance abuse program offered during his twenty-six months of incarceration and the completion of multiple online substance abuse courses while at Essex.  *See* Ex. C (List of programs Mr. Harris completed at Essex).  He hopes to be designated to a facility with a Residential Drug Abuse Program and mental health counseling so that he can receive formal treatment.  Mr. Harris has also used his incarceration as a time to heal and deepen relationships with those who can help him stay sober and away from criminal activity, many of whom have submitted letters of support to the Court.  *See* Ex. B.  Most significantly, Mr. Harris and his mother now speak nearly daily, and he reports that their relationship is the best that it has been since before he found out that Mr. Edmundson was not his father and started down the destructive path that defined his last two decades.

Mr. Harris's background does not excuse his conduct, but it helps explain it, and Courts have regularly considered similar backgrounds involving abuse, poverty, neglect, and drug addiction at sentencing.  For example, in *United States v. Bannister*, 786 F. Supp. 2d 617, 688 (E.D.N.Y. 2011), when explaining the rationale behind sentences that varied below the Guidelines and lamenting his inability to go below statutory minimums for certain defendants, Judge Weinstein emphasized the defendants' backgrounds, including that they were "subject to abuse, poverty, drug and alcohol addiction, unemployment, illiteracy, and learning disability."

*Id.* at 688.  Judge Weinstein noted that "[w]ell-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, to obtain crucial opportunities for education, work, and personal growth, and to act as useful role models."  *Id.*  Moreover, "[t]hose with learning disabilities would likely have been provided available resources to overcome their impairments at public expense."  *Id.* at 688-89.

Likewise, had Mr. Harris been provided the resources to process in a healthy way the physical and emotional abuse he endured in Tennessee and what amounted to the loss of a father and to treat his learning disabilities, as well as opportunities to nurture his interests and passions, who knows what path his life might have taken?  Instead, despite his mother's and grandmother's best intentions and efforts, Mr. Harris was largely deprived of those benefits.  As a result, he became addicted to drugs and a drug dealer.  These personal circumstances mitigate his conduct and counsel against a longer sentence.

Courts have also varied downward specifically on account of a defendant's history of drug addiction.  *See, e.g.*, *United States v. Turner*, 291 F. App'x 438, 439 (2d Cir. 2008) (holding district court did not err in sentencing defendant in heroin conspiracy higher than co-defendants, where, unlike co-defendants, defendant was not a drug addict); *United States v. Walker*, 252 F. Supp. 3d 1269, 1292–93 (D. Utah 2017); *United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1176 (N.D. Iowa 2014).  In *United States v. Hendrickson*, the court explained in detail the current scientific evidence on addiction, including that it is a disease that physically changes the brain, especially if it takes hold during a person's adolescence and young adulthood.  25 F. Supp. 3d at 1171–76.  Based on this scientific evidence, the court concluded that in most cases, addiction mitigates a defendant's culpability, stating, "[b]y physically hijacking the brain,

addiction diminishes the addict's capacity to evaluate and control his or her behaviors.  Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences."  *Id.* at 1174.  Mr. Harris's nearly twenty-year addiction that began when he was a pre-teen most certainly contributed to his offense conduct by impairing his judgment, and the Court should consider that mitigating factor when determining Mr. Harris's sentence.

### ii.     *Mr. Harris Is Genuinely Remorseful and Committed to Building a New, Law-abiding Life*

As evidenced by his letter to the Court, Mr. Harris is remorseful and self-reflective.  As he writes in his letter, he is "truly sorry for what [he] did."  Ex. A (Letter of Christopher Harris). He is sorry to "anyone [he] might've hurt" and "their families," his friends and family, and to "the people that look to[ him] to[] lead."  *Id.*  He describes his incarceration as "without a doubt the hardest experience in [his] life," but also "probably . . . the best thing for [him]" because it has "humbled [him] and made [him] realize all the things [he] got from drug dealing [do not] really matter at all."  *Id.*  What "really matters," he now realizes, is not the "superficial lifestyle" that he was chasing, but his time and the people who care about him. *Id.*  His plans for his future illustrate his commitment to this realization.  In conversations with counsel and in his letter, Mr. Harris has repeatedly expressed his desire to serve his sentence in a facility that offers meaningful substance abuse and mental health treatment so that he can continue to address his addictions and heal childhood traumas, work he intends to continue following his imprisonment. *Id.*  "[N]o longer scared to[] fail," "afraid of rejection," or concerned with "what people think," Mr. Harris hopes to pursue a career in show business or film following his release from prison in an effort to follow through on his childhood dreams of working in the arts.  *Id.*  As evidenced by

his letters of support, Mr. Harris has a community of people waiting to support him in his future

law-abiding endeavors.

           iii.     *Mr. Harris Is a Caring, Positive, and Intelligent Person Who Has Much to Offer His Community*

Notwithstanding Mr. Harris's difficult upbringing and struggles with substance abuse, his

family and friends attest to his good character, kindheartedness, and intelligence.  They continue

to stand by his side and are eager and willing to help him when he is released from prison.

Letters submitted by his friends and family illustrate Mr. Harris's capacity and desire to

help others, ranging from friends and family to strangers.  Mr. Harris's friend, Stephanie Cohen,

describes Mr. Harris as "the one person know that I can always call when I am in need."  Ex. B

(Letter of Stephanie Cohen).  Members of the Goins family, who have known Mr. Harris since

he was a child, all describe the care and attention that he provided to their elderly grandmother,

including visiting her and assisting her with running errands.  Ex. B (Letters of Keith Goins Jr.

and Rhonda Casey-Goins).  Mr. Harris's cousin, Lionel McCroy, writes "that Chris takes great

pride in playing an active role in the lives of all his nieces and nephews.  Attending birthday

parties, school functions, and baby-sitting his nieces and nephews on multiple occasions."  Ex. B

(Letter of Lionel McCroy).  His former girlfriend, Ms. Abujudeh, explains that Mr. Harris would

regularly donate clothing and shoes to Goodwill and money to fundraising campaigns on

Gofundme.com.  Ex. B (Letter of Mirna Abujudeh).  Likewise, Ms. Cohen recounts that Mr.

Harris volunteered to help the needy during Thanksgiving and would strike up conversations and

build relationships with people living on the streets, rather than walking by and ignoring them.

Ex. B (Letter of Stephanie Cohen).

Mr. Harris enriches the lives of those around him   He projects an infectious positivity—

even when he is struggling personally.  Mikhail Fekade, Mr. Harris's friend of over twenty years,

writes that, despite Mr. Harris's hardships, "he has always shown a positive attitude and outlook." Ex. B (Letter of Mikhail Fekade). He "is known to make everyone laugh." Ex. B (Letter of Cecilio Quintero). Those in Mr. Harris's circle also remark on his innate intelligence. His friend of thirteen years, Cecilio Quintero, describes Mr. Harris as "one of the smartest friends I have," *id.*, and Lionel McCroy describes him as a "smart young man with a lot of potential," Ex. B (Letter of Lionel McCroy). His ability to figure out the contours of the dark web and payment processes with cryptocurrency speak to Mr. Harris's intelligence and ability. That he opened and operated a successful, legal business demonstrates that he can apply his innate intellect and curiosity to lawful, prosocial endeavors.

Given Mr. Harris's warm and giving character, it is not surprising that his friends and family have all expressed to the Court their desire and commitment to supporting Mr. Harris while incarcerated and upon his release. *See, e.g.*, Ex. B (Letters of Patricia McCroy Harris, Andrea Harris, Louise Bickham, and Stephanie Cohen). Whenever he is released, Mr. Harris will have a robust network of support to draw on for his transition back to society.

C.     <u>The Conditions of Confinement to Which Mr. Harris Has Been Subjected Warrant Leniency</u>

The Court should also consider, and grant a substantial variance in accordance with, the harsh conditions of confinement which Mr. Harris has endured over the past twenty-six months. Mr. Harris spent two years of that time detained at Essex and was transferred to the MDC in November 2023.

Mr. Harris was arrested about a year and a half into the COVID-19 pandemic, right at the onset of the surge of the deadly Omicron variant. *See* Aya Elamroussi, *Omicron surge is 'unlike anything we've seen,' says expert*, CNN, Dec. 31, 2021, https://www.cnn.com/2021/12/30/health/Us-coronavirus-Thursday/index.html. As in the earlier

stages of the pandemic, circumstances in prisons and jails around the country continued to be
grim.  Opinions issued around the time that Mr. Harris was sent to Essex illustrate that the jail
was experiencing a surge of infections and overcrowding simultaneous with Mr. Harris's arrival.
For example, when denying the government's request to remand a defendant to Essex pending
sentencing in February 2022 (three months after Mr. Harris arrived there), Judge Stein noted that
"[b]oth the MDC and Essex are dealing with the continuing COVID-19 pandemic and all
attorney and family visits have been suspended at both jails until further notice.  In addition,
during the past several months, the MDC and Essex have been hamstrung by staffing issues,
quarantines due to COVID-19, and lockdowns due to security issues."  *United States v. Boyd*,
No. 21-CR-486 (SHS), 2022 WL 790771, at *2 (S.D.N.Y. Feb. 3, 2022) (internal quotations and
citations omitted); *see also United States v. Shaban*, No. 21 Cr. 314 (GHW), 2021 WL 4078020,
at *4 (S.D.N.Y. Sept. 8, 2021) (describing then-recent surge in COVID-19 at Essex).  In the fall
of 2021, Essex was also experiencing "overcrowding after the transfer of inmates to it following
the closure of a nearby Union County Facility."  *Boyd*, 2022 WL 790771, at *2.  As this Court
and numerous others have recognized, time served during the pandemic is substantially harder
than time served otherwise.  *See, e.g.*, *United States v. Rivera*, 16-CR-66 (S.D.N.Y. May 11,
2020) (Torres, J.) (sentencing to 3-month term on VOSR and stating that 3 months of COVID-19
time is substantially harsher than a normal 3-month sentence); *see also* Stephen Rex Brown,
*Brutal Conditions in NYC Jails During COVID Pandemic Caused Federal Judges to Impose
Lighter Sentences: Analysis*, N.Y. Daily News (July 11, 2021),
http://www.nydailynews.com/new-york/ny-federal-judges-gave-lighter-sentences-nyc-jails-
covid-20210712-owlofn4wzngmfmcgb6raighkvq-story.html (finding courts on average imposed
sentences 58% below Guidelines' recommendations).

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████ Mr.

Harris reported this incident to counsel in the summer of 2023 and we reported it to the government.  Notably, the government offered to move Mr. Harris to another facility, but the conditions at the MDC are at this point so notorious that Mr. Harris advised he would prefer to stay at Essex even under these disturbing circumstances.

Mr. Harris was ultimately moved to the MDC in November 2023.  His time there, though brief, also warrants a downward variance.  As Judge Furman detailed in his recent decision in *United States v. Chavez*, the conditions at MDC "are dreadful in many respects"—so much so that they qualified as "exceptional reasons" why detaining a defendant pending sentencing "would not be appropriate" under 18 U.S.C. § 3143(c).  *See* Opinion and Order at 9–18, *United States v. Chavez*, No. 22-CR-303 (JMF) (S.D.N.Y. Jan. 4, 2024), ECF No. 31.  Judge Furman highlighted three particularly "dreadful" aspects of the conditions at MDC.  "First, inmates at the MDC spend an inordinate amount of time on 'lockdown'—that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise," including reportedly for "much or all of the last three weeks . . . ."  *Id.* at 9.  Second, the MDC's notorious delays in providing medical and mental health treatment.  *Id.* at 10–12.  Third, the "problematic" state of the MDC's conditions, including mold, contaminated water, and vermin and pest infestations. *Id.* at 12–14.  Mr. Harris has borne the brunt of the MDC's lockdowns, having been on lockdown

for at least half of his time at MDC, including the recent three-week long lockdown discussed in Judge Furman's decision.  Mr. Harris's reports to counsel about the inadequacy of the food are consistent with what we have heard from other clients, who have reported rotten meat, an absence of hot meals, and simply not enough food for daily nutritional needs.

   D.  <u>A Sentence of Three to Five Years Is Sufficient to Meet the Goals of Sentencing</u>

   Mr. Harris acknowledges—and in no way minimizes—that narcotics trafficking and firearm possession by an individual with a felony record are serious offenses that require substantial punishment to reflect their seriousness and promote respect for the law.  A three-to-five years' sentence accomplishes that goal, however, and further punishment is unnecessary to do so.

   A sentence of three to five years adequately satisfies the purposes of specific and general deterrence, and the ten-year mandatory minimum is *far* more than necessary to achieve those goals.  Given that Mr. Harris's longest prior sentence, admittedly for almost identical conduct, resulted in ten months of imprisonment, the twelve-fold jump to a ten-year sentence is extreme. Logically, courts impose longer sentences "upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve."  *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).  The Second Circuit has explained, however, "[t]hat reason requires an appropriate relationship between the sentence for the current offense and the sentences, *particularly the time[] served*, for the prior offenses."  *Id.* (emphasis added).  By way of example, the *Mishoe* court noted that "if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect."  *Id.*  Considering the Second Circuit's logic, sentencing Mr. Harris to a term of imprisonment twelve times (or more) the length of his longest

prior incarceration goes far beyond what is necessary to achieve the goal of specific deterrence as to Mr. Harris.  A sentence of three to five years is thus more appropriate.

As for general deterrence, numerous studies, including those conducted by the Department of Justice, have found that "punishment is far more consistently found to deter crime than punishment severity."  Daniel Nagin and Greg Pogansky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of Deterrence: Theory and Evidence*, Criminology, 39(4) (2001); *accord* U.S. Dep't of Justice, Nat'l Institute of Justice, *Five Things About Deterrence*, https://www.nij.gov/five-things/pages/deterrence.aspx (last visited January 7, 2024) ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (while the certainty of being caught and punished has a deterrent effect, research shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects").  That Mr. Harris was apprehended and charged while actively committing the offense for which he is now being sentenced a little more than two years later, sends a strong message that those who sell drugs over the internet cannot hide behind the anonymity of the dark web—they will be caught and punished.  Empirical evidence shows that this is sufficient to achieve general deterrence.

Finally, the need to provide Mr. Harris with educational or vocational training, and medical care, strongly favors an exercise of leniency.  When Mr. Harris is released, he will return to therapy and continue to engage in substance abuse treatment.  He will also be able to return to his productive, lawful pursuits, including business ownership and producing his podcast.

E.      The Mandatory Minimum Sentence Fails to Achieve the Purposes of Sentencing

Mr. Harris's case is not an easy one for a sentencing judge.  On the one hand, he sold

significant quantities of methamphetamine over the dark web, after being previously convicted

and incarcerated for the same conduct.  On the other hand, Mr. Harris presents compelling

mitigation and strong reasons to believe, consistent with the dictates of § 3553(a), that a sentence

of substantially less than ten years would be sufficient to achieve the purposes of sentencing.

Accordingly, this case presents a stark example of the need for sentencing judges to conduct the

careful balancing required under the statute, and how mandatory minimum sentences based on

drug weight strip judges of the discretion to fulfill their statutory obligation.

Mandatory minimum sentences impede fair sentencing because they "eliminate the

ability of judges to take into account the full range of sentencing considerations under 18 U.S.C.

§ 3553, and deny defendants the opportunity to benefit from alternatives to incarceration."

*United States v. Rivera*, 281 F. Supp. 3d 269, 286 (E.D.N.Y. 2017).  Instead, "the government's

unreviewable decision to invoke [a] mandatory sentencing provision [makes] the actual facts

irrelevant."  *United States v. Dossie*, 851 F. Supp. 2d 478, 485 (E.D.N.Y. 2012).  "Harsh

mandatory sentences [thus] require courts to disregard or violate the wise commands of § 3553."

*United States v. Scott*, 990 F. 3d 94, 136 (2d Cir. 2021) (en banc) (Leval, J., dissenting).  For that

reason, judges across the political spectrum have denounced such sentencing provisions as

"[e]xtremely crude and simplistic" and "having little serious justification."  Gerard E. Lynch,

*Sentencing Eddie*, 91 J. Crim. L. & Criminology 547, 548, 559 (2001) (discussing criticisms of

mandatory minimums by, among others, then-Chief Justice William Rehnquist); *see also*

Anthony M. Kennedy, *Speech at the Am. Bar Ass'n Annual Meeting* (Aug. 9, 2003), *available at*

https://www.supremecourt.gov/publicinfo/speeches/sp_08-09-03.html ("I can accept neither the

necessity nor the wisdom of federal mandatory minimum sentences.  In too many cases,

mandatory minimum sentences are unwise and unjust.); *United States v. Young*, 766 F.3d 621, 634 (6th Cir. 2014) (Stranch, J., concurring) ("[I] join the continuous flood of voices expressing concern that . . . mandatory minimum laws are ineffective in achieving their purpose and damaging to our federal criminal justice system and our nation.").

In addition to hamstringing judges in performing their statutory duty, mandatory minimums fail to fulfill their statutory purpose. In enacting mandatory minimum drug sentences in the Anti-Drug Abuse Act of 1986 ("ADAA"), Congress sought to target the most serious offenders—kingpins leading drug organizations—with the highest penalties. But as Judge Gleeson discusses at length in *United States v. Dossie*, that effort failed from the beginning because "[t]he severe sentences it mandated to punish specified *roles* in drug-trafficking offenses were triggered not by role but by drug type and quantity instead." 851 F. Supp. 2d at 480. For example, "instead of hinging the ten-to-life sentence enhancement," the sentence applicable to Mr. Harris absent safety valve relief, "on the government's proof of 'kingpin' or leadership status, Congress simply used large[] drug quantities." *Id.* Tying enhancements to quantity, rather than role, is misguided, Judge Gleeson explains, because "[d]rug quantity is a poor proxy for culpability." *Id.* at 481. This mismatch "has turned a law that sought to impose enhanced penalties on a select few into a sentencing regime that imposes them on a great many, producing unfairly harsh consequences that Congress did not intend." *Id.* This case exemplifies such a harsh consequence: Mr. Harris inarguably is higher than a street-level dealer, but he is by no means a leader of an organization or a kingpin. He is not the kind of unredeemable defendant Congress imagined when it enacted the severe ten-to-life sentence in the ADAA. Even if he were, the Court would have ample discretion to sentence Mr. Harris up to and even above the Guidelines range within the zero-to-twenty statutory range of 21 U.S.C. § 841(b)(1)(C). But

because of the government's decision to apply the harshest statutory mandatory minimum here, its discretion may only go up—it cannot vary downward based on the substantial mitigation that exists in this case.  *See Scott*, 990 F.3d at 137 (Leval, J., dissenting) ("The net result is that the instances in which harsh mandatory sentencing statutes substantially influence the sentence are not those involving offenders who deserve the harsh sentences.").

Besides failing to comport with their statutory purpose, mandatory minimums have proven an utter failure as a matter of public policy.  Research demonstrates no improvement in drug abuse rates as a result of mandatory minimums—just the opposite.  For example, since data regarding illicit drug use by 8th, 10th, and 12th graders began to be collected in 1990, shortly after the ADAA was passed, such drug use increased and then remained relatively static until 2021.[13] *See* Miech, *et al.*, *Monitoring the Future national survey results on drug use, 1975–2023: Secondary school students*, Monitoring the Future Monograph Series, Institute for Social Research, Univ. of Mich. (2023), *available at* https://monitoringthefuture.org/results/annual-reports/.  A comprehensive fifty-state survey by the Pew Charitable Trusts in 2018 found *no correlation* between states with increased drug sentences and any reductions drug use, arrests, or overdoses.  Pew Charitable Trusts, *More Imprisonment Does Not Reduce States Drug Problems*, Mar. 2018, *available at* https://www.pewtrusts.org/-/media/assets/2018/03/pspp_more_imprisonment_does_not_reduce_state_drug_problems.pdf.

What have mandatory minimums accomplished?  Across multiple studies, empirical evidence has shown that they have dramatically increased the prison population.  *See id.* at 2

---

[13]    The data indicate that drug use increased during the first two years of the pandemic and has fallen significantly since then.  That reduction would appear to be related to factors outside of federal enforcement policy.  Indeed, the only change in federal enforcement policy that coincides with that timeline is the Biden Administration's encouragement to prosecutors to use their discretion *not* to charge mandatory minimums.

("Largely as a result of [the passage of ADAA], between 1980 and 2015, the number of federal prisoners serving time for drug offenses soared from about 5,00 to 92,000," which represents "nearly 50 percent" of the federal prison population).  And that explosion has occurred in a racially disparate manner.  Studies show that "mandatory minimum charges [have] resulted in Black individuals spending more time in prison than whites for the exact same crimes. In fact, prosecutors bring mandatory minimums 65 percent more often against Black defendants, all else remaining equal."  Alison Siegler, *End Mandatory Minimums*, Brennan Center for Justice (Oct. 18, 2021), *available at* https://www.brennancenter.org/our-work/analysis-opinion/end-mandatory-minimums#:~:text=The%20bipartisan%20Smarter%20Sentencing%20Act,minimums%20and%20respects%20human%20dignity; *accord* U.S. Sentencing Comm'n, *An Overview of Mandatory Minimum Penalties in the Federal Criminal Justice System* 37 (July 2017) ("Of the 8,342 offenders who were subject to a mandatory minimum penalty at sentencing, Black offenders were the largest group[.]").  One driver of this disparity is the higher likelihood of white defendants to be *relieved* of a mandatory minimum sentence, through a Guidelines provision such as the safety valve or cooperation, as well as through prosecutorial discretion, in comparison to Black defendants.  *See* U.S. Sentencing Comm'n, *Mandatory Minimum Penalties for Drug Offenses in the Federal Criminal Justice System* 33 fig. 17 (Oct. 2017) (percentage of white defendants obtaining no relief from mandatory minimum sentence was 35.3% in 2010 and 50.8% in 2016, while comparative percentages of Black defendants obtaining no relief was 59.5% and 64.5%).  Based on the government's charging decision here, this case risks becoming one such statistic.

        If the Court finds that Mr. Harris is not eligible for safety valve relief, he will be a casualty of our misguided and discriminatory national experiment with mandatory sentencing—a

result that will not serve the statutory sentencing aims outlined in § 3553(a), but rather will be yet another example of "precisely why harsh mandatory sentences inevitably become engines of needless injustice." *Scott*, 990 F.3d at 135 (Leval, J., dissenting) (emphasis omitted).  The Court should find that the safety valve does apply, or, in the alternative, impose the least-unjust sentence available to it—the minimum ten years.

## CONCLUSION

For the foregoing reasons, we respectfully submit that a sentence of three to five years' incarceration is sufficient, and not greater than necessary under Section 3553(a).

Dated: New York, New York
      January 9, 2024

SHER TREMONTE LLP

By:  */s/ Noam Biale*
      Noam Biale
      Katie Renzler
      90 Broad Street, 23rd Floor
      New York, New York 10004
      Tel: 212.202.2600
      nbiale@shertremonte.com

      *Attorneys for Christopher Harris*